261 F.3d 156 (2nd Cir. 2001)
 NEW YORK STATE NATIONAL ORGANIZATION FOR WOMEN, NEW YORK CITY CHAPTER OF THE NATIONAL ORGANIZATION FOR WOMEN, WESTCHESTER COUNTY CHAPTER OF THE NATIONAL ORGANIZATION FOR WOMEN, on behalf of themselves, their members, and all others similarly situated, and CLARICE SEEGARS, BERNADETTE THOMAS, DELLIE BRITT, and JANE DOE, as Administratix, on behalf of themselves, and all others similarly situated, Plaintiffs-Intervenors-Appellees-Cross-Appellants,
v.
GEORGE W. PATAKI, individually and as Governor of the State of New York, MARIO CUOMO, EDWARD MERCADO, individually and as Commissioner of the Division of Human Rights of the Executive Department of New York State, and MARGARITA ROSA, Defendants-Appellants-Cross-Appellees.
 Docket Nos. 98-9040(L), 98-9069(XAP), 99-9409(CON), 99-9430(XAP)
August Term 2000
 UNITED STATES COURT OF APPEALS, SECOND CIRCUIT
 Argued February 15, 2001
Decided: July 23, 2001
 
 Defendants-appellants appeal two orders of the District Court for the Southern District of New York (Robert L. Carter, Judge), one partially denying qualified immunity and the other awarding plaintiffs-appellees injunctive and declaratory relief following a bench trial. Both orders are from a class action brought by plaintiffs that alleges, pursuant to 42 U.S.C. § 1983, procedural due process violations by the New York State Division of Human Rights in its handling and processing of claims of discrimination.
 Finding that no constitutional violation has been presented, we vacate both orders and dismiss the procedural due process claims with prejudice.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 DAVID RAFF, Robert L. Becker, Raff & Becker, LLP, New York, N.Y., for Plaintiffs-Appellees- Cross-Appellants New York State National Organization for Women, New York City Chapter of NOW, Westchester County Chapter of NOW.
 EDWIN J. LOPEZ, Greater Upstate Law Project, Rochester, N.Y., for Plaintiffs-Intervenors- Appellees-Cross-Appellants Clarice Seegars, Bernadette Thomas, and Jane Doe.
 GERALD J. DUNBAR, Brooklyn, N.Y., for Plaintiff-Intervenor- Appellee-Cross-Appellant Dellie Britt.
 ELIOT SPITZER, Attorney General of the State of New York (Preeta D. Bansal, Solicitor General, Robert A. Forte, Deputy Solicitor General, and Adam L. Aronson, Assistant Solicitor General, of counsel), New York, N.Y., for Defendants-Appellants- Cross-Appellees.
 ELAINE R. JONES, NORMAN J. CHACHKIN, CHARLES STEPHEN RALSTON (NAACP Legal Defense and Educational Fund, Inc.) New York, N.Y.; MARGARET FUNG, KENNETH KIMERLING (Asian American Legal Defense & Educational Fund), New York, N.Y.; NANCY CHANG (Center for Constitutional Rights) New York, N.Y.; HERBERT EISENBERG (Davis & Eisenberg), New York, N.Y.; YOLANDA WU (NOW Legal Defense and Education Fund) New York, N.Y.; JUAN FIGUEROA (Puerto Rican Legal Defense and Educational Fund) New York, N.Y., for Amici Curiae on behalf of Plaintiffs-Intervenors- Appellees-Cross-Appellants.
 Before: WALKER, Chief Judge, MESKILL and CALABRESI, Circuit Judges.
 Judge Meskill joins the opinion and writes a separate concurrence with respect to Part I(B).
 Judge Calabresi joins the opinion except for Part I(B) and writes separately to explain his reasons.
 JOHN M. WALKER, JR., Chief Judge:
 
 
 1
 The present appeal arises from a 42 U.S.C. § 1983 class action brought by the New York State, New York City, and Westchester County chapters of the National Organization for Women (collectively "NOW"), and four individual plaintiffs-intervenors, seeking monetary, injunctive, and declaratory relief. See N.Y. Nat'lOrg. for Women v. Cuomo, 14 F. Supp. 2d 424, 426-27 (S.D.N.Y. 1998) ("NOW II"); see also N.Y. Nat'l Org. for Women v. Cuomo, 182 F.R.D. 30, 32-35 (S.D.N.Y. 1998) ("NOW I"). They have brought suit on behalf of
 
 
 2
 all persons who, since October 15, 1990, had filed or will file complaints of discrimination with the [New York State Division of Human Rights ("the Division" or "the Human Rights Division")] and whose complaints have not been, or will not be, finally administratively adjudicated or otherwise substantively resolved within three years of the date of the filing of the complaint [with the Division].
 
 
 3
 N.Y. Nat'l Org. for Women v. Pataki, 189 F.R.D. 286, 292 (S.D.N.Y. 1999) ("NOW III"). Of relevance to this appeal, they allege that the Division violated the class members' Fourteenth Amendment procedural due process rights through: (1) protracted delays in processing their discrimination claims that prejudiced the claims; and (2) purported notice deficiencies preceding the administrative convenience dismissal ("ACD") of their claims. Id. at 302-04. The defendants-appellants are the current Governor of New York, George W. Pataki; his predecessor Mario Cuomo; the current Commissioner of the Human Rights Division, Edward Mercado; and his predecessor Margarita Rosa. Id. at 291-92.
 
 
 4
 The defendants appeal from two orders of the District Court for the Southern District of New York (Robert L. Carter, District Judge): one that had partially denied them qualified immunity from money damages in their personal capacity, see NOW II, 14 F. Supp. 2d at 434, and a second, following a bench trial, that awarded plaintiffs injunctive and declaratory relief and ordered defendants to formulate a "Joint Remedial Plan" with plaintiffs to ameliorate the constitutional violations, see NOW III, 189 F.R.D. at 314-15. With respect to the district court's interlocutory order partially denying defendants' motion for qualified immunity, we have appellate jurisdiction under the collateral order doctrine. See, e.g., Mitchell v. Forsyth, 472 U.S. 511, 528-30 (1985). Our jurisdiction over the district court's grant of declaratory and injunctive relief and order of submission of a remedial plan is pursuant to 28 U.S.C. § 1292(a). See Spates v. Manson, 619 F.2d 204, 209 (2d Cir. 1980).
 
 
 5
 The propriety of both orders, as well as various issues raised by plaintiffs' cross-appeal, turns on whether the plaintiffs have asserted cognizable Fourteenth Amendment procedural due process violations as a result of the Division's handling and processing of the class members' claims of discrimination. Because we find that no procedural due process violations are presented, we vacate the district court's partial denial of qualified immunity and its award of injunctive and declaratory relief, and dismiss plaintiffs' procedural due process claims.
 
 BACKGROUND
 A. The Human Rights Law and the Division
 
 6
 Promulgated in 1945, New York's Human Rights Law, 18 N.Y. Exec. L. §§ 290-301, proscribes discrimination based on age, race, creed, color, national origin, sex, disability, genetic predisposition, carrier status, or marital status. See id. § 296. Such discrimination is prohibited in employment, housing, licensing, public accommodations, and public services, among other areas. See id.
 
 
 7
 An individual who is aggrieved by instances of discrimination prohibited under the Human Rights Law "may elect to seekredress in either an administrative or a judicial forum. As a general rule, the remedies are intended to be mutually exclusive." Legg v. Eastman Kodak Co., 670 N.Y.S.2d 291, 292 (App. Div. 4th Dep't 1998). The Division handles the administrative adjudication of claims. See 18 N.Y. Exec. L. § 297.
 
 
 8
 Until the law was changed in 1997, a complainant was precluded from dismissing the administrative action in order to file a complaint in court once he or she elected to proceed with the administrative process. In 1997, however, the New York legislature amended the Human Rights Law to permit a complainant to annul his or her election of the administrative process prior to a hearing and then proceed to court. See id. at § 297(9); see also Whidbee v. Garzarelli Food Spec., Inc., 223 F.3d 62, 75-76 (2d Cir. 2000); Legg, 670 N.Y.S.2d at 292; N.Y. Comp. Code R. & Regs. tit. 9, § 465.5(e)(vi). If such an annulment is made, any judicial proceedings are subject to New York's general three-year statute of limitations, measured from the occurrence of the discrimination, with no tolling for the period in which the claim was pending in the administrative process. See 18 N.Y. Exec. L. § 297(9); Sprott v. N.Y. City Hous. Auth., 1999 WL 1206678, at *2-*3 (S.D.N.Y. Dec. 16, 1999).
 
 
 9
 Upon a complainant's election to proceed in the administrative forum, the Division becomes responsible for the following: serving the respondent employer (or landlord), conducting an investigation, and making a "probable cause" determination. Id. at § 297(2); N.Y. Comp. Code R. & Regs. tit. 9, §§ 465.6 (investigations), 465.8 (probable cause review). If warranted, the Division will then issue a notice requiring respondent to answer and appear at a hearing before an administrative law judge, who will conduct a hearing, render a decision, and issue an order. See N.Y. Exec. L. § 297(4); N.Y. Comp. Code R. & Regs. tit. 9, §§ 465.11 (notice of hearing), 465.17 (orders after hearing). Unless a claimant wishes to retain a private attorney, the Division will assign one of its staff attorneys to present the case at the administrative hearing. See 18 N.Y. Exec. L. § 297(4)(a); see also N.Y. Comp. Code R. & Regs. tit. 9, § 465.13(d)(1)-(2). The Human Rights Law sets out time constraints on the Division's actions, see N.Y. Exec. L. §§ 297(2)(a) & (4), but these constraints have been deemed "directory, not mandatory." Hous. Opportunities Made Equal, Inc. v. Pataki, 716 N.Y.S.2d 215, 216 (App. Div. 4th Dep't 2000).
 
 B. The Due Process Claims
 
 10
 In their complaint, plaintiffs allege, in substance, two categories of purported procedural due process violations. The first category involves processing delays and the second involves defective notice.
 
 1. Processing Delays
 
 11
 In 1990, the Division began to experience substantial delays in its processing time for claims, and a sizeable backlog soon developed. Plaintiffs' statistician testified before the district court that of 43,227 cases the Division closed between October 15, 1990 and April 10, 1998, "34% of that total took more than three years from filing to closing," with the "mean time... somewhat in excess of 2½ years." NOW III, 189 F.R.D. at 295. He also testified that of 3,947 claims that received probable cause determinations, "the mean measured in days [for these claims to be finally resolved] was 2,005 days or 5.5 years." Id.
 
 
 12
 The plaintiffs attribute the Division's backlog to several causes including: (1) the failure of Governors Cuomo and Pataki to maintain the Division's funding at parity with the overall state fund disbursement togovernment operations; (2) the failure of the two governors to provide additional resources to the Division by temporarily redeploying state employees from other agencies; (3) the failure of Commissioners Rosa and Mercado to exercise their statutory authority to request staffing assistance from other governmental departments and agencies, see N.Y. Exec. L. § 295(4); and (4) the failure of the two commissioners to fill staff vacancies as they occurred.
 
 
 13
 The plaintiffs contend that the defendants' acts and omissions prejudiced class members' ability to succeed on their discrimination claims. As the plaintiffs' brief states:
 
 
 14
 The passage of time increases the likelihood that witnesses and documents will be unavailable, complainants will die, and memories will fade, which undermines the credibility of victims of discrimination, and non-victim witnesses. Thus, lengthy delays prejudiced complainants in their ability to prove their discrimination claims.
 
 2. Defective Notice
 
 15
 The second category of alleged procedural due process violations focuses on purported notice deficiencies related to certain claims the Division dismissed for administrative convenience. According to the plaintiffs, the Division, "to remedy the inordinate case processing delays," dismissed 5,152 cases between October 15, 1990 and April 10, 1998 "for [the Division's] administrative convenience ('ACD') on the grounds that it was unable to locate ('failure to locate') the complainant, or the agency determined that the complainant had failed to cooperate ('failure to cooperate')." The plaintiffs contend that these ACD dismissals violated due process because the Division failed (1) to reasonably attempt to locate claimants first, or (2) to unambiguously notify claimants that their claims were at risk of dismissal before issuing ACD's for failure to cooperate.
 
 C. The Subclasses
 
 16
 To address the plaintiffs' claims of prejudicial delay and ineffective notice, the class was subdivided as follows:
 
 
 17
 Subclass A: "[A]ll persons who have been, are, or will be subject to dismissal of their complaints because defendants Rosa and Mercado have taken longer than three years from the date the complaint was filed to render a final determination.";
 
 
 18
 Subclass B: "[A]ll persons who have been, are, or may be subject to a reduction in the monetary relief awarded, either by order of Rosa, Mercado, or by a court because defendants Rosa and Mercado have taken longer than three years from the date the complaint was filed to render a final administrative determination"; and,
 
 
 19
 Subclass C: "[A]ll persons who have been, are, or may be subject to ACD dismissals because the Division was either unable to locate complainants or had determined that the complainants had failed to cooperate and that their complaints had been pending for more than one year."
 
 
 20
 NOW III, 189 F.R.D. at 292.
 
 
 21
 Each subclass had different class representatives. Subclass A was represented by individual plaintiffs Jane Doe, administratix for the deceased John Doe, Dellie Britt, Bernadette Thomas, and Clarice Seegars, who had experienced processing delays respectively of five, seven, seven, and nine years. Subclass B was represented by plaintiff Seegars alone. No individual plaintiff represented subclass C; rather, as to subclass C, NOW proceeded as the class representative by mounting a facial challenge to the Division's publishedpolicies regarding the granting of ACD's for failure to locate or failure to cooperate. See, e.g., Common Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997) ("An organizational plaintiff... may have standing to sue on its own behalf 'to vindicate whatever rights and immunities the association itself may enjoy' or, under proper conditions, to sue on behalf of its members asserting the members' individual rights." (quoting Warth v. Seldin, 422 U.S. 490, 511 (1975))).
 
 DISCUSSION
 
 22
 We first consider the due process claims of subclasses A and B based on allegations of prejudicial delay, and then those of subclass C based on allegations of defective notice. We observe at the outset that the Fourteenth Amendment guarantee of due process is fully applicable to adjudicative proceedings conducted by state and local government administrative agencies. See Richardson v. Perales, 402 U.S. 389, 401-02 (1971).
 
 I. DELAY
 
 23
 The question we must resolve is: were the members of subclasses A and B denied constitutionally adequate process as a result of the delays they experienced while prosecuting their discrimination claims before the Division? Before this question may be answered in the affirmative, we must determine that: (1) the members of subclasses A and B possessed a constitutionally protected property interest, (2) the deprivation of which resulted from government action (3) without constitutionally adequate pre- or post-deprivation process. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982).
 
 A. Property Interest
 
 24
 There is no dispute that a legal cause of action constitutes a "species of property protected by the Fourteenth Amendment's Due Process Clause." Id.; see, e.g., Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 312-13 (1950); Polk v. Kramarsky, 711 F.2d 505, 508-09 (2d Cir. 1983). What the parties do dispute is whether this is the only property interest at issue in the instant case or whether, when a state affords alternative procedural forums for pursuing a cause of action as New York has here, individuals gain a constitutionally protected property interest not only in the cause of action, but also in the forum in which they elect to pursue that cause of action.[1] The district court held that the claimants here possessed a constitutionally protected property interest in pursuing their claims before the Division. See NOW III, 189 F.R.D. at 306. We disagree.
 
 
 25
 The only property interest at issue in this case is the legal cause of action itself, independent of the various procedural options available for pursuing the action. See Polk, 711 F.2d at 508-09; cf. McMenemy v. City of Rochester, 241 F.3d 279, 287-88 (2d Cir. 2001) ("Although New York State law clearly requires a 'competitive' examination, the law does not create a cognizable property interest in a competitive examination. An examination is not an end in itself; it has value only because it may lead to something valuable." (citing Bigby v. City of Chicago, 766 F.2d 1053, 1056 (7th Cir. 1985)); Fusco v. Connecticut, 815 F.2d 201, 205-06 (2d Cir. 1987)("The opportunity granted abutting landowners and aggrieved persons to appeal decisions of planning and zoning commissions and zoning boards of appeal is purely procedural and does not give rise to an independent interest protected by the [F]ourteenth [A]mendment.").
 
 
 26
 Our conclusion follows from the fact that procedural due process protects only important and substantial expectations in life, liberty, and property. See Ezekwo v. N.Y. City Health & Hosps. Corp., 940 F.2d 775, 783 (2d Cir. 1991) (procedural due process does not protect "trivial and insubstantial interest[s]"). "Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." Olim v. Wakinekona, 461 U.S. 238, 250-51 (1983) (emphasis added); see Montgomery v. Carter County, Tennessee, 226 F.3d 758, 768 (6th Cir. 2000) ("What the Due Process clauses of the Fifth and Fourteenth Amendments protect is 'life, liberty, [and] property,' not the procedures designed to protect life, liberty, and property." (internal citation omitted) (alterations in original)). Here, the only substantive expectation that warrants constitutional recognition is the entitlement under New York law to remedy injuries resulting from discrimination proscribed by the Human Rights Law. See Ezekwo, 940 F.2d at 782 ("While state law defines the underlying substantive interest, 'federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause.'" (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978))).
 
 
 27
 Indeed, the only distinct interest claimants appear to have in vindicating their rights before the Division, rather than in state court, is that "'[t]he administrative forum offers a complainant remedies not available from a court.'" NOW III, 189 F.R.D. at 306 (quoting Marine Midland Bank v. N.Y. State Div. of Human Rights, 75 N.Y.2d 240, 244 (1989) (alterations in original)). Yet, recovery of these additional remedies in any particular case hinges on the Division exercising its discretion to actually award one or more of these remedies.
 
 
 28
 The Fourteenth Amendment due process guarantee, however, only extends to property claims to which an individual has a "legitimate claim of entitlement." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). Where, as here, a purported property interest is contingent on the exercise of executive discretion, no legitimate claim of entitlement exists. "[A] constitutionally protected interest cannot arise from relief that the executive exercises unfettered discretion to award." Sad v. INS, 246 F.3d 811, 819-20 (6th Cir. 2001); see also Baldwin v. Daniels, 250 F.3d 943, 946 (5th Cir. 2001) ("Discretionary statutes do not give rise to constitutionally protectable interests."); cf. Shaner v. United States, 976 F.2d 990, 994-95 (6th Cir. 1992) (holding that loan contingent on agency's "broad discretion in determining whether to approve [the] application" was "too speculative to be considered a property right"). Thus, the claimants' interest in the additional remedies afforded in the administrative process is not a property expectation as to which the Constitution mandates due process.
 
 
 29
 Accordingly, we hold that the class members' only constitutionally protected property interest at issue here is the discrimination cause of action itself.
 
 B. Government Deprivation
 
 30
 Having identified the protected property interest, we turn to whether the membersof subclasses A and B suffered a deprivation. The parties appear to agree that if New York were to have flatly precluded a claimant from pursuing his or her discrimination claim in all available procedural forums and thereby extinguished the claim, a deprivation would have occurred. See, e.g., Logan, 455 U.S. at 432-33; cf. Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 488 (1988) (due process implicated where proceedings "completely extinguished appellant's claim"). The parties, however, are in sharp disagreement over whether government action--or in this case inaction--that does not finally extinguish a claim, but nonetheless prejudices it, can also constitute a government deprivation.
 
 
 31
 Accepting the plaintiffs' contention, the district court held that "an administrative delay causing actual prejudice to a [claimant's] claim is sufficient to show deprivation under the due process clause." NOW III, 189 F.R.D. at 307; see also Pepsico, Inc. v. Rosa, 612 N.Y.S.2d 74, 75 (App. Div. 2d Dep't 1994) (holding that almost ten-year delay alone, without "showing of substantial prejudice," would not extinguish discrimination claim). Indeed, the district court went so far as to hold that this formulation was already "clearly established" in our constitutional jurisprudence. NOW II, 14 F. Supp. 2d at 431. The district court further concluded that "[a]ctual prejudice is shown when plaintiff[s] demonstrate[] that delay led to the loss of documentary evidence or a key witness." NOW III, 189 F.R.D. at 308.
 
 
 32
 Below, we consider first the district court's conclusion that it is "clearly established" that bureaucratic delay plus actual prejudice can constitute a deprivation, and, finding that it was not clearly established, we then consider whether this formulation is sufficient to establish a deprivation.
 
 1. Qualified Immunity
 
 33
 The district court's holding, for purposes of qualified immunity, that it was "clearly established" that administrative delay followed by actual prejudice constitutes a government deprivation was considerably wide of the mark. See NOW II, 14 F. Supp. 2d at 430-32.
 
 
 34
 A government actor performing a discretionary task is entitled to immunity from § 1983 suits if his or her "action did not violate clearly established law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996); see Warren v. Keane, 196 F.3d 330, 332 (2d Cir. 1999). "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear'" in the context of the alleged violation such "'that a reasonable official would understand that what he is doing violates that right.'" LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).
 
 
 35
 None of the cases relied on by the district court satisfy this standard. Logan v. Zimmerman Brush Co., which the district court stated "control[led]" the denial of qualified immunity, NOW II, 14 F. Supp. 2d at 430-31, held only that "the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." Logan, 455 U.S. at 434 (emphasis added); see also post at 173-74 (Meskill, J., concurring) (Draft at 2-3). The "final destruction" addressed in Logan resulted from an Illinois statute that flatly extinguished a plaintiff's cause of action, not from government delay that prejudiced the claim.
 
 
 36
 The remaining cases relied on by the district court, which it characterized collectively as "stand[ing] commandingly for the proposition that administrative delay"leading to actual prejudice "may violate the due process clause," NOW II, 14 F. Supp. 2d at 431, are inapposite to the situation at hand. See also post at 174-75 (Meskill, J., concurring) (Draft at 4-6). Those cases were concerned with the effect of delay on the adequacy of post-deprivation remedies, and, unlike the situation here, did not involve the issue of whether government delay, in and of itself, can constitute a deprivation. See, e.g., Kraebel v. N.Y. City Dep't of Hous. Pres. & Dev., 959 F.2d 395, 404-06 (2d Cir. 1992) (considering whether delay in affording post-deprivation relief violated due process); Isaacs v. Bowen, 865 F.2d 468, 476-77 (2d Cir. 1989) (same); G.I. Distribs. v. Murphy, 469 F.2d 752, 756-57 (2d Cir. 1972) (same), vacated & remanded, 413 U.S. 913 (1973), and reaff'd by 490 F.2d 1167 (2d Cir. 1973).
 
 
 37
 2. The Delay-Plus-Actual-Prejudice Formulation
 
 
 38
 Substantial--likely insurmountable--difficulties surround the district court's delay-plus-actual-prejudice formulation. See also post at 176 (Meskill, J., concurring) (Draft at 8-9). Without excusing New York's gross bureaucratic delays, the fact remains that plaintiffs are generally the masters of their legal actions. As such, they bear the responsibility for preventing actual prejudice to their claims by investigating, memorializing testimony from potentially forgetful or absent witnesses, and preserving documents.
 
 
 39
 While the claimants here did not have resort to the full battery of discovery devices generally afforded litigants in courts of law, our review of the Human Rights Division's rules of practice indicates that claimants are afforded sufficient means to prevent--well before any period of delay that might be considered constitutionally suspect--the types of prejudice the district court identified as actionable (i.e., loss of documentary evidence and loss of key witnesses). Claimants may engage an attorney, see N.Y. Code R. & Regs. tit. 9, §§ 465.12(b) & 465.13(a), who in turn, prior to the hearing before the ALJ, may apply to have the Division subpoena parties and witnesses for depositions and document production, see N.Y. Comp. Code R. & Regs. tit. 9, § 465.14, and, during the hearing, may directly subpoena parties and witnesses, see id. at § 465.14(2)(c). See also State Div. of Human Rights v. Univ. of Rochester, 386 N.Y.S.2d 147, 148 (App. Div. 4th Dep't 1976) ("This power to issue subpoenas... was designed to make evidence available at a hearing on the merits. Before a determination of probable cause, the complainant may be represented by an attorney but the matter is to be investigated by the [Division].").
 
 
 40
 Moreover, due to the relaxed nature of the Division's evidentiary rules, claimants may introduce at the hearing before the ALJ subpoenaed materials in lieu of live testimony, thus ameliorating prejudice a claimant might otherwise experience due to absent witnesses, see, e.g., N.Y. Comp. Code R. & Regs. tit. 9, §§ 465.12(e)(1) ("Hearsay evidence is fully admissible."); (e)(3) ("Documentary evidence may be admitted without testamentary foundation, where reasonable."); (e)(5) ("Information from witnesses may be introduced in the form of affidavits, without oral examination and cross examination."); (e)(9) ("Written stipulations may be introduced in evidence if signed by the person sought to be bound thereby or by that person's attorney-at-law.... The entire record may be in the form of a stipulation, submitted to the chief administrative law judge without the convening of a hearing before an administrative law judge."); (e)(11) ("Where reasonable and convenient, the administrative judge may permit the testimony of a witnessto be taken by telephone...."). With these tools at hand, we have little doubt that claimants have it within their ability to ensure that their claims are not unduly prejudiced by any delay on the Division's part in affording a hearing.
 
 
 41
 Compounding our doubts as to the district court's conclusion that delay coupled with actual prejudice constitutes a due process deprivation is the fact that the only cases we have uncovered that adopted this formulation as part of a due process inquiry arose in a completely inapposite context.[2] See, e.g., Consol'n Coal Co. v. Borda, 171 F.3d 175, 183 (4th Cir. 1999); DeMichele v. Greenburgh Cent. Sch. Dist., 167 F.3d 784, 791 (2d Cir. 1999); Lane Hollow Coal Co. v. Dir., OWCP, 137 F.3d 799, 807-08 (4th Cir. 1998); United States v. Elsbery, 602 F.2d 1054, 1059 (2d Cir. 1979). In each of these cases, the defendant, not the plaintiff, was alleged to have been prejudiced as a result of a delay, and the delays involved were in the receipt of notification that proceedings would be instigated, not delay in actually litigating the matter once both parties were on notice of the proceedings. Thus, the delay in notifying the defendants in these cases denied them, throughout the entire period of the delay, an opportunity to preserve records, memorialize witness accounts, and maintain other materials necessary to advance a meaningful defense. Here, by contrast, both the claimants and the respondents were always aware that they would, if only belatedly, be expected to present their case before the Division.
 
 
 42
 Because, as we discuss below in Part I(C), we hold that constitutionally adequate process was afforded the members of subclasses A and B, we need not finally resolve whether actual prejudice to a cause of action following a period of extreme government delay is sufficient to make out a property deprivation, or whether instead the government action must flatly extinguish the cause of action before a property deprivation can be made out. Accord Hous. Opportunities Made Equal, Inc., 716 N.Y.S.2d at 216 (holding that complaints before the Division must be "extinguished" to give rise to a due process violation). It suffices to say at this juncture that we have deep reservations.
 
 C. Adequate Process
 
 43
 Regardless of whether a property deprivation occurred, it is plain that the members of subclasses A and B were afforded procedures that satisfied the Fourteenth Amendment's due process requirement. In reaching this conclusion, we follow the now familiar analysis set forth by the Supreme Court in Matthews v. Eldridge, 424 U.S. 319, 335 (1976). The Matthews analysis requires us to weigh: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrativeburdens that the additional or substitute procedural requirement would entail." Id.; see also Logan, 455 U.S. at 434; Holman v. Hilton, 712 F.2d 854, 859 n.7 (3d Cir. 1983).
 
 
 44
 After balancing these considerations, the district court concluded that the Division's processing delays were "clearly unreasonable" and the claimants were denied due process. NOW III, 189 F.R.D. at 310. While the processing delays were extensive and may well have been unreasonably so, we cannot agree with the district court's conclusion that due process was denied.
 
 
 45
 In carrying out the Matthews analysis, the district court failed to consider the availability of other procedures that could have prevented the claimants from suffering prejudicial delay. More precisely, the district court erred in not considering Article 78 proceedings and how (if utilized by the claimants) these proceedings could have reduced claimants' risk of experiencing prejudicial delay. See N.Y. C.P.L.R. 7801-06.
 
 
 46
 In an Article 78 proceeding, New York state courts are empowered to issue "common law writs of certiorari to review, mandamus, and prohibition." Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996); see N.Y. C.P.L.R. 7801 ("Relief previously obtained by writs of certiorari to review, mandamus or prohibition shall be obtained in a proceeding under this article."); see also Hamptons Hosp. & Med. Ctr., Inc. v. Moore, 52 N.Y.2d 88, 91 (1981) (holding that an Article 78 proceeding may lie in the absence of a final determination where the relief sought is by way of prohibition or mandamus to compel performance by an administrative agency of a duty enjoined by law); see generally David D. Siegel, CPLR Provided Escape from Common Law Technicalities, 73 N.Y. St. B.J. 10, 14 (January 2001). Once the delay in the processing of any claim of the members of subclasses A and B became unreasonable, each member could have brought an Article 78 proceeding to mandamus Division officials to proceed expeditiously to resolve the discrimination claim. See, e.g., Katz v. Klehammer, 902 F.2d 204, 207 (2d Cir. 1990) ("To the extent that the Housing Law and state and city regulations compel the supervising and other city officials to perform certain acts, Article 78 may thus serve to enforce such requirements when officials fail to fulfill these obligations."); Hous. Opportunities Made Equal, Inc., 716 N.Y.S.2d at 216 (noting that state courts may "grant[] mandamus to compel hearings"); Tall Trees Constr. Corp. v. Zoning Bd. of Appeals, 717 N.Y.S.2d 369, 370-71 (App. Div. 2d Dep't 2000) (Article 78 proceeding directing zoning board, which had "relied on its tie vote to unduly delay taking any decisive action," to conduct a new hearing on petitioner's zoning applications within 30 days), lv. to appeal granted, 96 N.E.2d 710 (2001). By doing so, the members of subclasses A and B could have substantially reduced, if not eliminated, the risk of prejudice to their claims from further delay.
 
 
 47
 Given the availability of Article 78 procedures, which can be invoked before actual prejudice arises (unlike a § 1983 damage claim, which presumably would arise only after actual prejudice had occurred), we find that the second Matthews factor weighs dispositively in favor of the government. Thus, we hold that New York has afforded the members of subclasses A and B all of the process they are due under the Fourteenth Amendment of the Federal Constitution.[3] See, e.g., River Park, Inc.v. City of Highland Park, 23 F.3d 164, 167 (7th Cir. 1994)(holding availability of common law writ of certiorari adequate process for zoning board delay); Orange Lake Assocs., Inc. v. Kirkpatrick, 21 F.3d 1214, 1221, 1224 (2d Cir. 1994) (stating that zoning board's delay did not violate due process because, inter alia, Article 78 procedure constituted adequate process); see also Bello v. Walker, 840 F.2d 1124, 1128 (3d Cir. 1988) ("[A] state provides adequate due process when it provides 'reasonable remedies to rectify a legal error by a local administrative body.'" (internal quotation marks omitted)).
 
 
 48
 Two final points warrant mention. First, recognizing the state courts' responsibility for preventing Division delays through Article 78 proceedings is more consistent with the "spirit" of federalism than is unnecessarily subjecting state agencies to intrusive federal court intervention under the guise of § 1983. See, e.g., Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 276 (1997) (Kennedy, J., joined by Rehnquist, C.J.) ("It is a principal concern of the court system in any State to define and maintain a proper balance between the State's courts on one hand, and its officials and administrative agencies on the other hand.... Where, as here, the parties invoke federal principles to challenge state administrative action, the courts of the State have a strong interest in integrating those sources of law within their own system for the proper judicial control of state officials."); Albright v. Oliver, 510 U.S. 266, 284 (1994) (Kennedy, J., concurring, joined by Thomas, J.) (noting generally the importance of considering "the delicate balance between state and federal courts" in the "design of § 1983" causes of action).
 
 
 49
 Second, by contemplating that claimants seek relief through Article 78 proceedings, we are not contravening the general rule that exhaustion is not required for § 1983 claims. See Patsy v. Bd. of Regents, 457 U.S. 496, 516 (1982); see generally Erwin Chemerinsky, Federal Jurisdiction § 8.4 (3d ed. 1999). "[E]xhaustion simpliciter is analytically distinct from the requirement that the harm alleged has occurred. Under the jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).
 
 II. NOTICE
 
 50
 NOW, as subclass C's representative, asserts that the Division failed to provide constitutionally adequate notice to the members of subclass C before it dismissed for administrative convenience ("ACD") their discrimination claims for failure to locate or failure to cooperate. The district court agreed with NOW, concluding that the "Division did not take all reasonable steps" to locate and inform "complainants that their claims were at risk for ACD, and therefore deprived complainants of their claims without adequate predeprivation notice." NOW III, 189 F.R.D. at 309. For the reasons we discuss below, we disagree.
 
 
 51
 A. Is Notice Required?
 
 
 52
 When a government agency terminates or impairs an individual's constitutionallycognizable property interest through adjudicative proceedings, due process requires that the individual be given adequate notice for the proceedings to be "accorded finality." Craft, 436 U.S. at 13 (quoting Mullane, 339 U.S. at 314); see also Sterling v. Envtl. Control Bd., 793 F.2d 52, 56-58 (2d Cir. 1986).
 
 
 53
 The New York Attorney General, arguing on behalf of the defendants, contends that notice is not required prior to an ACD for failure to locate or for failure to cooperate because the ACD does not extinguish a claimant's cause of action. Rather, the Attorney General argues, a claimant whose claims are ACD'd becomes free to pursue his discrimination claim in New York state court and further that the three-year statute of limitations for bringing suit is tolled during the entire pendency of the Division's proceedings. Cf. N.Y. Exec. L. § 297(9); N.Y. C.P.L.R. 204(a); see also Marine Midland Bank, 75 N.Y.2d at 244-45. Notably, this differs from the situation in which the claimant annuls his or her election of remedies, where the statute of limitations for bringing suit in state court is expressly not tolled during the pendency of the administrative proceedings. See N.Y. Exec. L. § 297(9).
 
 
 54
 Were we to find that the Attorney General's reading of section 297(9) is correct, we would agree that the ACDs for failure to locate and for failure to cooperate did not deprive claimants of their discrimination claims and thus do not trigger due process scrutiny. This is because a complaint must be filed with the Division within one year of the accrual of a cause of action, whereas a state court action must be commenced within three years. See N.Y. Exec. L. § 297(5); Marine Midland Bank, 75 N.Y.2d at 244-45. Thus, under the Attorney General's reading, a complainant would always have at least two years remaining following an ACD in which to proceed with an action in state court. Moreover, individualized notice to a claimant is not required for purposes of the running of the statute of limitations. See, e.g., United States v. Locke, 471 U.S. 84, 108-10 (1985); Texaco, Inc. v. Short, 454 U.S. 516, 536-37 (1982); see generally Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 17.8, at 104 (3d ed. 1999) ("When individual interests are adversely affected by legislative action [such as a statute of limitations], there is no notice issue, because publication of a statute is normally considered to put all individuals on notice of a change in the law of a jurisdiction."); Kenneth Culp Davis & Richard J. Pierce, Jr., 2 Administrative Law Treatise § 9.2, at 3-9 (3d ed. 1994).
 
 
 55
 NOW, however, advances an equally persuasive rebuttal argument. NOW contends that the Attorney General's reading "would vitiate the election of remedies mandate," see 18 Exec. L. § 300, because a claimant "could compel an ACD simply by refusing to cooperate with the Division's process," and then file in state court with the benefit of the statute of limitations having been tolled. See, e.g., N.Y. Comp. Code R. & Regs. tit. 9, § 465.5(e)(vi) (intimating legislative concern that "administrative convenience dismissal[s]" not "contravene the election of remedies provisions"); Legg, 670 N.Y.S.2d at 292 (same).
 
 
 56
 Recognizing that resolution of this question has significant import to the administration of state judicial proceedings, we leave it for the New York state courts to decide the proper understanding of section 297(9) in the first instance. Doing so, however, does not affect our ability todispose of this case because, as we discuss in Part B below, we find that NOW has failed to establish that the notice afforded members of subclass C offends due process.
 
 
 57
 B. Has NOW Established Inadequate Notice?
 
 
 58
 In mounting a facial challenge, NOW asserts that the Division's published ACD policy ("the Policy") is unconstitutional on its face.[4] See NOW III, 189 F.R.D. at 304. In so doing, it "bear[s] [the] heavy burden" of demonstrating that, as written, the Policy "'could never be applied'" in a manner that would afford claimants constitutionally adequate notice. Sanitation & Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 992 (2d Cir. 1997) (quoting N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 11 (1988)) (emphasis added).
 
 
 59
 As for those members of subclass C whose claims were ACD'd for failure to locate, the district court agreed with NOW that the Division's published Policy, as promulgated, did not afford them constitutionally adequate notice. See NOW III, 189 F.R.D. at 311. The Policy requires that before such dismissals can be granted, staff members must attempt to contact the claimants by, among other means, mailing "two letters, the second letter being certified." Id. at 296. The district court found that the Policy's provision for the use of the mails to contact claimants who have moved violates due process because the postal service's "mail forwarding ceases after one year." Id. at 311; see also id. at 315 (ordering that the Division "use the Internal Revenue Service Mail Forwarding Service to locate persons whose claims are at risk for ACD"). We disagree.
 
 
 60
 Due process does not require that parties actually receive notice of the pendency of the government deprivation. All that is required is that the method and form of the notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane, 339 U.S. at 314 ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); see Pope, 485 U.S. at 484, 489-91 (1988). "There is 'no rigid formula as to the kind of notice that must be given; notice required will vary with circumstances and conditions.'" Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 254 (2d Cir. 1995) (quoting Walker v. City of Hutchinson, 352 U.S. 112, 115 (1956)).
 
 
 61
 In reaching its conclusion that the Division's reliance on mail forwarding was insufficient, the district court apparently gave no weight to the claimants' responsibility to provide the Division with updated contact information whenever they change addresses. Upon filing a claim with the Division, claimants (1) are informed that they must notify the Division "of any change in [their] address, telephone number or place of employment" and that "failure to do so may jeopardize [their] rights," (2) are provided with a change-of-contact-informationform, and (3) are informed again in a follow-up letter of their obligation to notify the Division if they change their address.
 
 
 62
 Simply put, we believe that when parties that are litigating claims before a government agency are obligated to notify the agency of a change of address, a requirement that the agency do more than rely on the latest information provided it by the litigants when sending out notice would demand a level of government paternalism that due process does not require. Cf. Small v. United States, 136 F.3d 1334, 1337 (D.C. Cir. 1998) (holding that "when the government knows (or can easily ascertain) where a person may be found, it must direct its notice there, and not to some other address where the designee formerly resided").
 
 
 63
 Accordingly, with respect to those members of subclass C whose claims were ACD'd for failure to locate, we hold that the Division's use of the mails to send notice to the last address furnished to the Division comports with due process. See Grievance Comm. v. Polur, 67 F.3d 3, 6 (2d Cir. 1995) (per curiam) (discussing adequacy of use of mails for notice).
 
 
 64
 Next, we consider whether those members of subclass C whose claims were ACD'd for failure to cooperate were provided with adequate notice that their claims were at risk of being dismissed. In its consideration of this issue, the district court relied exclusively on the Division's "Post-1991 ACD letters," which it found violated due process because, it believed, the letters did not unambiguously notify complainants that they should contact the Division in order to avoid dismissal. See NOW III, 189 F.R.D. at 309.
 
 
 65
 Even assuming the Post-1991 ACD letters were deficient--a question we do not decide--we find that the district court erred by exclusively focusing its due process inquiry on the sufficiency of the notice provided in these letters.[5] As we have already noted, to succeed on its facial challenge NOW must establish that under "no set of circumstances" would the Division's ACD Policy be constitutionally adequate. Reno v. Flores, 507 U.S. 292, 301 (1993) (internal quotation marks omitted). That determination simply cannot be made by looking to the Post-1991 ACD Letters alone because the Policy also requires that a Division staff member "make two phone calls to attempt to contact the [non-cooperating] complainant, one during the day, and one after 7:00 PM" before the claim can be ACD'd. The information the Division's staff communicated during those phone calls, taken alone, may have provided the claimants with constitutionally sufficient notice that their discrimination claims were at risk of being dismissed for failure to cooperate. What's more, since this question is plainly fact specific to each claimant, it is not appropriately the subject of a facial challenge.
 
 
 66
 For the foregoing reasons, we hold that NOW has failed to establish that the Division provided constitutionally deficient notice before it ACD'd the discrimination claims of the members of subclass C.
 
 CONCLUSION
 
 67
 Because no constitutional violation has been shown, the plaintiffs' procedural dueprocess claims are dismissed with prejudice. As a consequence, the district court's order denying the defendants qualified immunity and its award of injunctive and declaratory relief in favor of the plaintiffs are vacated.
 
 
 68
 We have carefully considered plaintiffs' cross-appeal and find it without merit.
 
 
 69
 The present panel will retain jurisdiction over any further appeals that may arise in this case.
 
 
 70
 Each side to bear its own costs of appeal.
 
 
 
 NOTES:
 
 
 [1]
 Of course, we do not mean to say that this is all the parties dispute in this case. We are simply noting their competing views as to the constitutionally-protected property right at issue.
 
 
 [2]
 In a recent opinion issued while this appeal was pending, the Appellate Division for the Fourth Department intimated that a claimant may be able to bring a state law claim for money damages against state officials if the claimant can establish "substantial actual prejudice [to his or her discrimination claim] resulting from [the Division's] delay." See Hous. Opportunities Made Equal, Inc., 716 N.Y.S.2d at 216 (internal quotation marks omitted). We need not consider the issue here, however, because the plaintiffs have not raised such a state law claim in their complaint, and indeed would be precluded from doing so in federal court under the Eleventh Amendment, see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 104-05, 121 (1984).
 
 
 [3]
 Because we hold that Article 78 proceedings provide a meaningful pre-deprivation remedy, we need not decide whether the "alleged deprivations"--i.e., processing delay followed by actual prejudice--are "random and unauthorized," or instead are based in established state procedures. See Alexandre v. Cortes, 140 F.3d 406, 411 (2d Cir. 1998) (noting that the existence of independent state post-deprivation remedies are a defense only when the deprivation at issue was "random and unauthorized").
 
 
 [4]
 The district court properly dismissed for lack of standing NOW's "as applied" challenge, which alleged that the "Division failed to follow its own procedures for contacting complainants and therefore arbitrarily extinguished plaintiffs['] rights." NOW III, 189 F.R.D. at 304. Such a challenge would plainly require examination of facts specific to each claimant concerning whether the Division's particular efforts to locate and inform each of them that they were at risk for an ACD comported with the strictures of due process. See, e.g., Rent Stabilization Assoc. v. Dinkins, 5 F.3d 591, 596-97 (2d Cir. 1993).
 
 
 [5]
 Indeed, by doing so, the district court arguably treated NOW's claim as an "as applied" challenge, for which NOW clearly would lack standing. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977) (holding that an organization has standing to sue on behalf of its members only if, inter alia, "neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.").
 
 
 MESKILL, Circuit Judge, concurring:
 
 71
 I concur in the result reached and in Chief Judge Walker's treatment of all the issues in this case. I write separately to address plaintiffs' "delay-plus-actual prejudice equals deprivation" theory, which was adopted and found clearly established by the district court and commented upon favorably by Judge Calabresi in his separate opinion.
 
 
 72
 Chief Judge Walker expresses "deep reservations" about the theory. I agree and would go further. I would hold that the Division's delay in processing a plaintiff's claim could not constitute a deprivation of a constitutionally protected property interest under the Due Process Clause. In support of the "delay-plus-actual prejudice equals deprivation" theory, the plaintiffs and the district court unreasonably stretch existing precedent, while advocating an impermissibly narrow reading of our holding in Polk v. Kramarsky, 711 F.2d 505 (2d Cir. 1983), a case that can and should dispose of this action.
 
 A. Logan and the Unreasonable Delay Cases
 
 73
 Plaintiffs primarily rely on Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), and two of this Court's prior decisions, Kraebel v. N.Y. City Dep't of Hous. Pres. & Dev., 959 F.2d 395 (2d Cir. 1992), and Isaacs v. Bowen, 865 F.2d 468 (2d Cir. 1989), to support their argument that delay-plus-actual prejudice equals deprivation.
 
 1. Logan
 
 74
 In Logan, the Supreme Court framed the issue before it as "whether a State may terminate a complainant's cause of action because a state official, for reasons beyond the complainant's control, failed to comply with a statutorily mandated procedure." 455 U.S. at 424 (emphasis added). The plaintiff had filed a cause of action with the Illinois Fair Employment Practices Commission (Commission), which, under Illinois law, had 120 days to convene a factfinding conference. See id. The Commission inadvertently scheduled the conference for five days after the statutory deadline. See id. at 426. Logan's employer thereafter challenged the Commission's jurisdiction to hear the claim. The Illinois Supreme Court ultimately upheld that challenge, holding that the 120 day period was a jurisdictional requirement. See id. at 426-27. This ruling effectively terminated Logan's cause of action without the benefit of a hearing.
 
 
 75
 The Supreme Court stated that the Illinois statutory scheme, as interpreted and enforced by the state courts, destroyed Logan's ability to have his claim heard. See id. at 432 (reasoning that "any other conclusion would allow the State to destroy at will virtually any state-created property interest" (emphasis added)); id. at 434 (noting that "the deprivation here is final" (emphasis added)). The Court concluded that "the State may not finally destroy a property interest without first giving the putative owner an opportunity to present hisclaim of entitlement." Id. (emphasis added) (footnote omitted). In reaching its conclusion, the Court relied on prior decisions where it had found that deprivations occurred when the state "terminate[d] every right which beneficiaries would otherwise have," id. at 429 (emphasis added) (internal quotation marks omitted), "cut[] off [beneficiaries'] rights," id. (quotation marks omitted), "dismissed" plaintiff's claims, id. (emphasis added), "den[ied] potential litigants use of established adjudicatory procedures," id. (emphasis added), or "deprive[d] someone of... access" to the courts. Id. at 430 n.5 (emphasis added). The Court's opinion is replete with references to the total extinguishment or final destruction of an individual's cause of action. There is nothing in the opinion that supports the view that a state's delay in adjudicating an existing cause of action constitutes such an extinguishment or destruction.
 
 
 76
 Further examination of other Due Process cases decided by the Supreme Court leads to a similar conclusion. See, e.g., Tulsa Prof'l Collection Servs. v. Pope, 485 U.S. 478, 488 (1988) (Tulsa) ("The entire purpose and effect of the nonclaim statute is to... forever bar untimely claims[] and... the... proceedings... have completely extinguished appellant's claim.") (emphasis added). While it is always possible to cherry-pick broader language from certain Supreme Court decisions, see, e.g., id. ("adversely affect"); Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798 (1983) (Mennonite) ("drastically diminishes the value"), when placed in context, those same cases reveal that the Court found a deprivation only when faced with a discrete state action that either completely extinguished plaintiff's property interest or drastically reduced the known or measurable value of that interest. See Tulsa, 485 U.S. at 488 (nonclaim statute extinguished and "forever bar[red] untimely claims"); Mennonite, 462 U.S. at 798 (tax sale "immediately and drastically diminishe[d] the value of th[e] [mortgagee's] interest"); Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 311 (1950) ("The effect of this decree... [is] that every right which beneficiaries would otherwise have... is sealed and wholly terminated."). In contrast, the plaintiffs' theory would allow claimants to show a deprivation of their interests by the gradual erosion -- through the passage of time rather than by any affirmative state action -- of their ability to prove their claim.
 
 2. The Unreasonable Delay Cases
 
 77
 The district court also relied heavily on the notion that "delay can be so unreasonable as to deny due process, such as when it is inordinately long." Isaacs, 865 F.2d at 477; see also, e.g., Kraebel, 959 F.2d at 405 ("[I]mplicit in the conferral of an entitlement is a further entitlement, to receive the entitlement within a reasonable time.") (quoting Schroeder v. City of Chicago, 927 F.2d 957, 960 (7th Cir. 1991)). As the Court's opinion adequately points out, these cases dealt with the adequacy of post-deprivation process, not with whether a deprivation occurred in the first place. Kraebel could not be more clear: "[T]he question of the timing of that processing and payment relate not to her property right,... but to the adequacy of the process she is receiving." 959 F.2d at 405 (emphasis added).
 
 
 78
 By way of illustration, assume in Logan that the Illinois statutory scheme provided that after a 120 day dismissal the claimant was entitled to a hearing. Assume further that the hearing would determine whether the failure to meet the deadline was theclaimant's fault or due to the state's negligence, and where the latter was shown, the claimant's action would be immediately reinstated. I have little doubt that the Supreme Court would have upheld such a scheme. If, however, Illinois took five years to hold the post-dismissal hearing, plaintiff would claim (successfully, I imagine) that the delay was sufficiently egregious to violate the post-deprivation process rule in Kraebel and Isaacs. But that is not this case. We cannot reach the question in Kraebel and Isaacs until the plaintiffs first demonstrate that they have been deprived of a property interest.
 
 
 79
 In his separate opinion, Judge Calabresi cites Agins v. City of Tiburon, 447 U.S. 255, 263 n.9 (1980), for the suggestion that "extraordinary delay" in "the process of governmental decisionmaking" that impairs the use or value of property may be a "`taking' in the constitutional sense." Notwithstanding the infirmities of applying the Supreme Court's Takings Clause jurisprudence in a Due Process case such as this one, the comparison reveals another fundamental misconception. In the typical Takings Clause case, the government's delay in processing or granting, for example, a zoning permit impairs the owner's use of property. The right to use one's property has no inherent need for governmental interference and undue delay arising out of such interference is rightly actionable. The plaintiffs' property interest here is a cause of action. State, federal or administrative procedures are needed to prosecute such a claim. Stated differently, in the zoning context, the adjudication is a government imposed burden. In a cause of action, the adjudication is a government provided benefit, without which the claimant's cause of action would be worthless. Unfortunately, there are delays, sometimes excessive ones. Neither the federal government, state governments nor local administrative agencies are immune from delays. In my view, remedying those inefficiencies falls within the state political, rather than the federal judicial, sphere.
 
 
 80
 In summary, all of the cases relied on by the plaintiffs and the district court and those cited by Judge Calabresi are inapposite to our determination of whether the state deprived the plaintiffs of a property interest.
 
 B. Polk v. Kramarsky
 
 81
 While the Supreme Court's Due Process Clause jurisprudence arguably leaves room for the plaintiffs' theory, our decision in Polk expressly forecloses any attempt to expand the definition of "deprivation" to encompass the instant claim.
 
 
 82
 In Polk, we answered "the question whether undue delay by a New York state agency in processing a discrimination claim... gives rise to... a violation of due process." 711 F.2d at 506 (internal citation omitted). We held that it did not. Mr. Polk based his due process claim on the assertion that "the delay in processing his complaint substantially prejudiced the preparation and prosecution of his discrimination action and caused him financial as well as emotional injury." Id. at 508. We distinguished Logan because Polk's claim, irrespective of any prejudice, was not finally destroyed:
 
 
 83
 Here, Polk's right of action has survived, albeit long delayed. Logan is therefore distinguishable. As the Logan Court opined: "To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement."
 
 
 84
 Id. at 509 (citation and footnote omitted). We did not hold that prejudice to a claimant's ability to prove a cause of action, if it could be shown, would constitute a deprivation.Indeed, our express holding states the opposite. Id. We specifically held in Polk that (1) the Division's delay "violated both the spirit and the letter of [its] procedural provisions," (2) "[a]t no time was Polk -- who was proceeding pro se for most of this period -- informed by the Division that it could not or would not comply with the State's own time requirements," (3) Polk was not "informed of the interrelationship between the remedies and procedures under New York and federal law," and (4) "the Division did not do its job." Id. at 507, 509. We still found no due process violation. In holding otherwise, the district court was "considerably wide of the mark." See Majority Op. at 165.
 
 
 85
 Accordingly, our decision in Polk, in addition to a common sense reading of the Supreme Court's Due Process Clause cases, should deter us from expanding the definition of deprivation to include "actual prejudice."
 
 
 86
 C. Plaintiffs' Theory Creates an Unworkable Rule of Law
 
 
 87
 Even assuming we had carte blanche to fashion a rule akin to the plaintiffs' theory, we should not. Equating prejudice through delay with the final destruction or extinguishment required for a deprivation would create bad law.
 
 
 88
 In addition to the practical reasons advanced by Chief Judge Walker, see Majority Op. at 166-67, I am particularly concerned that it would be impossible to set firm and clear guidelines for determining when prejudice rises to the level of deprivation. The point at which delay equals deprivation would inevitably vary from case to case, making it impossible for the state to set up a procedure for pre- and post-deprivation hearings. Further, such a rule would allow any plaintiff who testifies to actual prejudice to create an issue of fact for trial. As far as I can tell, Judge Calabresi, even only in passing, has thus far refined the plaintiffs' theory into the "un-warned-of-delay-plus-actual-prejudice-in-appropriate-circumstances-equals-deprivation" formula. See Concurring Op. at 177. I shudder to think how district courts throughout the country would interpret such an amorphous concept. In all likelihood, those determinations will be highly inconsistent and will come at great expense to state agencies created to help the alleged victims of discrimination.
 
 
 89
 Today's decision appears to mark the practical end of plaintiffs' theory in this Circuit because Article 78 in New York, and its equivalents in Connecticut and Vermont, provide adequate pre-deprivation due process. However, because the "delay-plus-actual prejudice equals deprivation" formulation, with or without refinements, would be bad law fashioned without regard to precedent, policy or practical sense, I would hammer one more nail in its coffin.[1]
 
 CONCLUSION
 
 90
 For the reasons discussed, I would hold that delay in state adjudicative proceduresdoes not constitute a deprivation of a cognizable property interest under the Due Process Clause of the Fourteenth Amendment.
 
 
 
 NOTE:
 
 
 [1]
 Judge Calabresi admonishes Chief Judge Walker and me for engaging in "unnecessarily broad dicta" and asserts that the issue of whether a deprivation has occurred is not properly before this Court. Concurring Op. at 177 n.4. I fail to see how my advocating an additional (and I believe firmer) ground for the Court's holding is dicta. Also, Judge Calabresi's attempt to sidestep this issue is compromised by the record. The district court expressly held that the state's delay deprived the plaintiffs of a protected property interest and the parties briefed that issue on appeal, extensively discussing each of the cases cited in this opinion. While Judge Calabresi clearly disagrees with the substance of my views on the plaintiffs' theory, he fails to advance, or even cite, any legal support for his blanket attack on my position.
 
 
 CALABRESI, J., concurring:
 
 91
 I concur in the court's holding and in the reasoning needed to support that holding. I also join all of the court's opinion except Part I(B), which discusses both qualified immunity and whether a claim of delay plus actual prejudice is sufficient to allege a deprivation of property cognizable under the due process clause. I decline to join this portion of the opinion because our holding, in Part I(C), fully disposes of the issue before us and renders Part I(B) unnecessarily broad dicta. Given the conclusion that the availability of Article 78 proceedings means that the plaintiffs have received all the process that they are due, it is, I think, undesirable (a) to reach out to say that, because the plaintiffs' rights were not clearly established when the defendants acted, the defendants enjoy qualified immunity and (b) to reach out yet further to suggest, even tentatively, that the plaintiffs were not in fact deprived of a protected property interest at all. I write separately to underscore the fact, readily conceded in the court's opinion, that all such comments are dicta,[1] and to express my view that these questions are best left to another day. See United States v. U.S. Gypsum, Co., 333 U.S. 364, 402 (1948) (Frankfurter, J., concurring) ("[T]he Court confessedly deals with an issue that 'need not be decided to dispose of this case.' Deliberate dicta, I had supposed, should be deliberately avoided.").
 
 
 92
 In Part I(B), the majority's opinion expresses "deep reservations" about the notion that delay to a plaintiff's legal claim plus actual prejudice to that claim can constitute a property deprivation that triggers due process protections. In reaching its conclusion, the majority speculates about issues of law and fact which are both much closer and much harder than the opinion suggests. I believe that were the issues properly before a panel of this court, we might well conclude that unwarned-of delay plus actual prejudice could in appropriate circumstances deprive a plaintiff of a property interest that triggers due process rights. Compare Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982) (holding that a violation of due process occurred when an administrative error caused the Illinois Fair Employment Practices Commission to hear a plaintiff's antidiscrimination claim after the expiration of a statutorily mandated limitations period, with the result that the delay finally and irrevocably extinguished the plaintiff's claim in every forum),[2] with Polk v. Kramarsky, 711 F.2d 505, 509 (2d. Cir. 1983)(finding that no violation of due process transpired when an administrative delay merely deprived a plaintiff of a particular forum for pursuing an antidiscrimination claim and the plaintiff made no plausible showing that this delay prejudiced the assertion of the claim itself, given that the claim remained fully viable in some other forum).[3] Accordingly, I cannot join the majority's attempt to preclude through its advisory comments a full discussion of issues which can only be adequately treated if and when they are squarely presented by a future case.[4]
 
 
 93
 I believe that the majority opinion's discussion of qualified immunity in Part I(B)(1) is also unnecessary, and thus as much dicta as its discussion of delay plus actual prejudice in Part I(B)(2). Unlike the court's comments on the delay plus actual prejudice theory, however, qualified immunity could have been the basis of a narrower-and hence generally more suitable-resolution of this case. Under this approach, we would have begun by rejecting the plaintiffs' claims for money damages on the ground of qualified immunity. In doing so, we would have observed that the plaintiff's delay plus actual prejudice theory has not been clearly established, even to date. Moreover, although the Supreme Court has said, in County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5 (1998), that courts of appeals confronted with a qualified immunity defense should ordinarily establish underlying rights before ruling on qualified immunity, we have previously read this mandate as not applying in certain "appropriate cases." Horne v. Coughlin, 191 F.3d 244, 248 (2d Cir. 1999). And we would have explained why this is such a case.[5]
 
 
 94
 We would then have rejected the plaintiffs' claim for injunctive relief on the ground that a plaintiff seeking an injunction in federal court must demonstrate that there is a real danger that the act she seeks to have enjoined will actually take place. This, we would have noted, requires more than the mere possibility or fear that the action will occur. See, e.g., Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 60 (1975). Finally, we would have pointed out that the very fact that the defendants in this case enjoy qualified immunity presupposes a finding that defendants have not, up to this point, committed any acts that they reasonably believed to be unconstitutional. Because federal courts should not enjoin state officials' future conduct, absent specific evidence that these officials have flouted or are likely to flout reasonably discernable constitutional commands, and because there is no reason to think that state officials will not, in the future, and on their own, warn claimants of the delays inherent in the administrative process and thereby eliminate any undue prejudice that such delays might otherwise cause, no current basis for an injunction would exist.
 
 
 95
 I repeat that none of this discussion of the effects of a finding of qualified immunity is needed to decide this case. I outline it only to point out that, on this basis, too, reaching the merits of the plaintiffs' delay plus actual prejudice theory is unnecessary. And this fact makes the majority's dicta with respect to the latter theory yet more troublesome. Comments on constitutional questions, and, in particular, comments on difficult ones, should generally be avoided by courts where alternative grounds for decision are available. Cf. Hutchinson v. Proxmire, 443 U.S. 111, 122 (1979). And they should even more likely be avoided when, as here, there exist not one but two relatively narrow grounds that completely decide the case.
 
 
 
 NOTES:
 
 
 [1]
 The opinion twice notes that the bulk of the discussion in Part I(B) is not necessary to deciding the case before us. Thus, the opinion states that,
 [r]egardless of whether a property deprivation occurred, it is plain that the members of subclasses A and B were afforded procedures [in the form of New York State Article 78 suits] that satisfied the Fourteenth Amendment's due process requirement.
 [See Majority Op. at 167]. And, presumably in light of this recognition, the opinion makes clear that it need not finally resolve whether actual prejudice to a cause of action following a period of extreme government delay is sufficient to make out a property deprivation, or whether instead the government action must flatly extinguish the cause of action before a property deprivation can be made out.
 [See Majority Op. at 167].
 
 
 [2]
 The Supreme Court noted that the plaintiff might have been able to seek a post-termination remedy through an independent State tort action, but expressly held that this possibility did not provide the plaintiff with constitutionally adequate process. Id. at 346-37.
 
 
 [3]
 Cf. Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 488 (1988); Kraebel v. New York City Dep't of Hous. Pres. and Dev., 959 F.2d 395, 405 (2d Cir. 1992); Isaacs v. Bowen, 865 F.2d 468, 477 (2d Cir. 1989). In an analogous area of constitutional law, eminent domain jurisprudence, the Supreme Court has also suggested that although "mere fluctuations" in property value during an unsuccessful condemnation proceeding are simply "incidents of ownership," government action that causes "extraordinary delay" in "the process of governmental decisionmaking" may constitute "a 'taking' in the constitutional sense." Agins v. Tiburon, 447 U.S. 255, 263 n.9 (1980).
 
 
 [4]
 Judge Meskill's concurring opinion goes beyond the majority in its determination to decide what is not before this court. In doing so, it reads narrowly cases it does not like, ignores language damaging to its position that is found in those cases, and instead emphasizes language-that could appropriately be described as dicta-in cases it favors. It then seeks to define as unworkable a "formula" that has hardly been presented, let alone refined into a holding that might guide lower courts. I think it is unwise to engage, in dicta, in a discussion of whether what past opinions have said is dicta or holding. And I also do not wish to argue in the abstract about the feasability of holdings that a court might someday make in appropriate cases. It is enough to say that Judge Meskill's reading of the cases leaves me unconvinced, and hence, all the more determined to leave any analysis of these cases, and of the practicality of rules that might be derived from them, to the time, if ever, when a case or controversy properly presents the issues to us.
 
 
 [5]
 For example, reaching the substance of the plaintiffs' delay plus actual prejudice claim requires addressing difficult questions of constitutional law. Moreover, since persons in the plaintiffs' position will normally seek, as the plaintiffs themselves have sought, injunctive relief, "[t]here is no reason to believe that the [delay plus actual prejudice theory] will repeatedly, or over substantial time, escape judicial review in federal court by reason of qualified immunity." Horne, 191 F.3d at 250. Under such circumstances, the Sacramento suggestion loses much of its force.