367 F.3d 87
 Nidia BARCIA, individually and on behalf of all others similarly situated, Municipal Labor Committee, on behalf of the employees it represents, Kettely Laraque, Michael Wernham, Charles Rosa, Soso Liang Lo, Joan Miller, John Paulsen, Esperanza Polanco, Joyce Glotzer, individually and on behalf of all others similarly situated, Plaintiffs-Appellees,
v.
Louis SITKIN, as Chairman of the New York State Unemployment Insurance Appeal Board, James R. Rhone, Esq., Arthur A. Strauss, Harry Zankel, G. Douglas Pugh, as members of the New York State Unemployment Insurance Appeal Board, Philip Ross, as Industrial Commissioner of the State of New York, New York State Department of Labor, New York State Unemployment Insurance Appeal Board, Defendants-Appellants.
 No. 03-7715.
 United States Court of Appeals, Second Circuit.
 Argued: January 13, 2004.
 Decided: May 10, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Deon J. Nossel, Senior Assistant Solicitor General (Michael S. Belohlavek, Deputy Solicitor General, of counsel, Eliot Spitzer, Attorney General of the State of New York, on the brief), Office of the Attorney General of the State of New York, New York, NY, for Defendants-Appellants.
 David Raff (Robert L. Becker, of counsel), Raff & Becker, LLP, New York, NY, for Plaintiffs-Appellees.
 Before: CABRANES and RAGGI, Circuit Judges, and MUKASEY, District Judge.*
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 The principal questions we consider are whether, in the circumstances presented, the United States District Court for the Southern District of New York (Robert L. Carter, Judge) erred in (1) denying an application to modify a consent decree entered into in 1983, and (2) granting three requests for enforcement of the decree and for further relief. The consent decree was the result of consolidated class actions challenging the practices and procedures of the Unemployment Insurance Appeal Board, a body established by the State of New York to determine eligibility for unemployment benefits. By resolving their dispute through entry of a consent decree, the parties employed a "hybrid" form of judgment that has elements of both a contract and a judicial decree, Firefighters v. Cleveland, 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), for a consent decree (or consent judgment) is "an agreement of the parties entered upon the record with the sanction and approval of the court," Schurr v. Austin Galleries of Illinois, Inc., 719 F.2d 571, 574 (2d Cir.1983); see also Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). A consent decree "normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). Through the decree in the instant case, the plaintiff class — claimants of unemployment insurance benefits who are, will be, or have been subjected to adverse determinations by the Unemployment Insurance Appeal Board (collectively, "plaintiffs") — obtained injunctive relief from the Unemployment Insurance Appeal Board ("the Board").[1]
 
 
 2
 The Board appeals from an order of the District Court entered June 16, 2003, which denied the Board's motion for modification of the consent judgment to terminate its monitoring provisions, granted in part and denied in part plaintiffs' motion for enforcement and other relief, and denied plaintiffs' motion for modification to develop a revised and arguably expanded compliance plan. The Board contends that the District Court erred in (1) denying its motion for modification, and (2) granting in part plaintiffs' motion for enforcement and other relief.
 
 
 3
 In considering whether the District Court erred with regard to the parties' requests for modification and enforcement — requests properly before the Court because of its ongoing jurisdiction over the consent decree — it is not our role to evaluate the merits of the consent decree. Instead, our role is to determine whether the District Court properly construed and applied the consent decree for purposes of its implementation and enforcement.
 
 
 4
 For the reasons that follow, we reverse the District Court's partial grant of plaintiffs' motion for enforcement and other relief, and we affirm in all other respects.
 
 I. BACKGROUND
 A. The Consent Judgment
 
 5
 We begin by setting forth the procedures and practices of the Board as relevant to this case:
 
 
 6
 Under New York law, an individual claiming entitlement to unemployment insurance benefits files a claim with the local employment office of the New York State Department of Labor serving the area in which he or she was last employed or resides. N.Y. Labor L. § 596(1). "The validity of the claim and the amount of benefits payable to the claimant" are determined in accordance with regulations and procedures established by New York's Commissioner of Labor, who issues the initial determination of the claim. Id. § 597(1). A person dissatisfied with the Commissioner's determination may request a hearing before an Administrative Law Judge ("ALJ"),[2] who acts under the supervision of the Board. Id. § 620(1). The ALJ is required to give prompt written notice of his or her decision ("initial decision"). Id. § 620(3). The decision is deemed a decision of the Board, unless a party appeals from the ALJ's decision to the Board. Id. The Board may decide any case appealed to it on the basis of the existing record, or it may elect to hold an additional hearing. Id. § 621(3). The Board "may affirm or reverse, wholly or in part, or may modify the decision appealed from and shall render its decision promptly and shall thereupon send written notice thereof together with the reasons therefor" to the affected parties. Id. From the Board's decision, which is final on all questions of fact, a person may seek judicial review of questions of law by appealing to state court — specifically, to the Appellate Division of the New York State Supreme Court, Third Department. Id. §§ 623(1), 624.
 
 
 7
 In 1979 and 1980, plaintiffs commenced four class actions,[3] later consolidated, challenging the practices and procedures of the Board and seeking injunctive relief and damages. They asserted, among other things, that the Board, in deciding appeals before it and in its supervision over ALJs, deprived plaintiffs of benefits without fair and impartial hearings, in violation of the Social Security Act, 42 U.S.C. § 503(a), and the due process clause of the Fourteenth Amendment, remediable by 42 U.S.C. § 1983.[4] Deprivations asserted by plaintiffs include the ALJs' failures to: provide specific notice of the basis for denying or contesting benefits; permit cross-examination; allow confrontation of witnesses and documents; act as an impartial adjudicator; permit the introduction of documents; permit a closing statement; and decide the case based upon substantial evidence.
 
 
 8
 On March 1, 1983, after discovery but prior to any dispositive ruling by the District Court, the parties submitted to the Court a proposed consent judgment and decree ("the Consent Judgment"), which settled all of plaintiffs' claims without any admission of liability by the Board. The Consent Judgment — "detailed, specific, and born of vigorous and explicit negotiations," Barcia v. Sitkin, 1996 WL 251848, at *4 (S.D.N.Y. May 10, 1996) (denying plaintiffs' 1996 motion to modify) — provided injunctive relief to plaintiffs by instituting a "long list of procedural safeguards to claimants" to ensure proceedings that conform to due process, Barcia v. Sitkin, 1983 WL 44294, at *1 (S.D.N.Y. Aug.1, 1983). As pertinent here, the Consent Judgment, in a section entitled "Review," imposed obligations on the Board in its review of ALJ decisions appealed to it.[5] For cases covered by the Consent Judgment, the Board[6] was required to use one of two checklists, set forth in appendices to the Consent Judgment, to determine whether any procedural irregularities had occurred in the case's proceedings before the ALJ. See Consent Judgment ¶¶ 39-43. The checklist attached to the Consent Judgment as Appendix E ("E Checklist") was for review of all current or prospective cases on appeal ("current cases"), i.e., those cases decided by the Board subsequent to July 11, 1983, the effective date of the Consent Judgment; the checklist attached as Appendix F ("F Checklist") was to be used to review retroactively those cases decided prior to the effective date of the Consent Judgment but reopened under its terms ("past cases"), i.e., all cases in which claimants were denied unemployment insurance benefits by the Board between March 1, 1978 and July 11, 1983. Id. ¶¶ 39, 43. The E Checklist contained a list of 32 numbered procedural errors, and the F Checklist contained a shorter but similar list — the difference reflecting Board procedures that had been changed or added by the Consent Judgment and that were applicable only to so-called current cases. Id. For past cases, the Board was required to send a notice of reopening[7] to the claimant, who, in order for the case to receive further consideration by the Board, was directed to return a response form requesting reconsideration. For past cases in which the Board received an affirmative response from the claimant, and in all current cases, the Board reviewed the records of the ALJ proceedings. If the Board, in reviewing those records, found any of the errors listed on the applicable checklist, and further found that the error affected the rights of the individual, the Consent Judgment required the Board to "take such action which it deems necessary and where no action was deemed necessary, the Board shall state on the checklist and it shall specify the reason or reasons for such decision." Id. ¶ 68. Possible remedial actions included a new hearing and the opportunity to submit additional evidence.
 
 
 9
 The Consent Judgment also provided that plaintiffs had the right to monitor the Board's compliance with the Consent Judgment.[8] Id. ¶¶ 41-43. The monitoring provisions granted plaintiffs' counsel access to copies of all completed checklists (for both current and past cases), which were maintained in a "Master checklist file," and access to certain complete case files of current and past cases. Id. Relevant to this appeal, concerning access to case files of current cases, is the provision of the Consent Judgment that granted plaintiffs' counsel, for a three-year period, the right to inspect the files of 600 randomly selected cases per year. Id. ¶ 42. Although the inspection period was set to expire in 1985, the Consent Judgment provided that "nothing herein shall preclude plaintiffs from making an application to the court to extend the expiration date or to have the provisions reinstated after the expiration date." Id.
 
 
 10
 Finally, the Consent Judgment stated that the District Court retained jurisdiction to, "among other things, entertain any motion or application involving any alleged violation of the consent judgment's terms, entertain any application involving the interpretation or implementation of any provision of the consent judgment, or entertain such other motions or applications that may be made regarding the consent judgment." Id. ¶ 69.
 
 
 11
 On August 1, 1983, the District Court filed an opinion approving the Consent Judgment. Barcia v. Sitkin, 1983 WL 44294 (Aug. 1, 1983). The Court observed that in Moore v. Ross, 687 F.2d 604 (2d Cir.1982), certain procedures of the Board, similar to the ones challenged by the plaintiffs here, had been found "sufficient to withstand due process scrutiny, particularly since appeal could be taken from an adverse decision to state court that had final oversight to determine whether specific procedures met due process requirements" and, therefore, "[h]ad the [instant] case gone to trial, the Board procedures which had been upheld in Ross undoubtedly would have been upheld here." 1983 WL 44294, at *3. But the Court stated that other claims brought by plaintiffs might have been meritorious,[9] and it observed that "[t]here were risks in taking the case to trial" and that the parties, in crafting the Consent Judgment, had "negotiated lengthy and precise" terms. Id. For these reasons, the Court approved the Consent Judgment.
 
 
 12
 B. Relevant Stipulations and Modifications to the Consent Judgment
 
 
 13
 Since 1983, the Consent Judgment has been modified by several stipulations of the parties and has been the subject of numerous motions for modification, enforcement, contempt, and other relief. We set forth here the four actions relevant to this appeal.[10]
 
 
 1. 1985 Stipulation
 
 
 14
 On June 6, 1985, the District Court approved a stipulation submitted by the parties that extended the three-year monitoring period by establishing an additional three years for plaintiffs' counsel to review a sample of current cases ("1985 stipulation"). The stipulation further provided that, upon the extended period's conclusion in 1988, "the parties shall discuss the need for an [additional] extension of the review period and the time period of such extension. [The Board] shall not unreasonably refuse plaintiffs' counsels' request for an extension."
 
 
 2. 1994 Order
 
 
 15
 In an order dated September 8, 1994 ("1994 order"), the District Court addressed two issues relevant to this appeal. First, it considered plaintiffs' request to find the Board in contempt of court for terminating in 1992 plaintiffs' access to a random sample of current case files. The Board had taken the position that plaintiffs' counsel no longer had any right to such access because, upon the conclusion of the three-year extension established by the 1985 stipulation, the monitoring period had automatically expired as of 1988 and had not been renewed. Plaintiffs contended that the extension established by the 1985 stipulation had not yet terminated, despite the three-year limitation embodied in that stipulation, and that because the Board had concluded otherwise and terminated access to plaintiffs' counsel, it was in violation of the Consent Judgment. Plaintiffs further contended that, in any event, it would have been unreasonable for the Board to refuse to extend the monitoring period, even in 1994 when plaintiffs filed their motion. As an alternative to a contempt finding, plaintiffs moved for a declaration that continued compliance with the monitoring provisions was required. See Barcia v. Sitkin, 865 F.Supp. 1015 (S.D.N.Y.1994).
 
 
 16
 The District Court agreed with plaintiffs that the monitoring period had not yet ended, "not[ing] that, although denominated a `three year review period,' the Monitoring Period was not keyed simply to the passage of time." Id. at 1022. The Court determined that the period could not be terminated in the absence of a discussion between the parties regarding the need to extend the period, and it found that no such discussion had taken place. The Court further found that, had such a discussion taken place in 1988, the Board could not have refused reasonably to extend the monitoring provision. Id. at 1021-22. Accordingly, the Court concluded that the monitoring period established in 1985 had not yet ended, id. at 1022, and, in light of the Court's finding that the Board was at that time in contempt on various grounds, further concluded that the monitoring period should continue for another two years — until 1996 — "at which time the parties shall be expected to comply with the provisions of [the 1985 stipulation] and discuss whether the Period should be extended again," id. at 1034.
 
 
 17
 The second issue addressed by the District Court in its 1994 order was the proper standard to be applied in determining whether a checklist violation was sufficiently serious to warrant a merits review of the case by the Board. Id. at 1032-33. Rejecting the Board's use thus far of an outcome-determinative test, the Court agreed with plaintiffs that the merits of a case should be reviewed if the checklist violation may have affected the outcome of the case. Id. at 1032-33.[11]
 
 
 3. 1996 Order
 
 
 18
 In an order dated August 21, 1996, the District Court addressed plaintiffs' motion seeking sanctions, contempt, enforcement, modification, and other relief. Barcia v. Sitkin, 945 F.Supp. 539 (S.D.N.Y.1996) ("1996 order"). The Court found the Board to be deficient in numerous respects in complying with its obligations under the Consent Judgment (including obligations imposed by the 1994 order), see id. at 542-45, and, notably for our current review of the matter, found "disturbing" plaintiffs' data indicating that the checklist violation rate had "increased dramatically, from 28.53% in 1991-92 to 43.97% in 1994 to 51.19% in the first half of 1995," id. at 546. However, instead of imposing the modifications to the checklist process requested by plaintiffs, such as a computer-based process, the Court scheduled a conference at which both parties would discuss "the reasons for the high rate of violations and possible means for ameliorating the situation consistent with the Consent Judgment." Id. at 546. Subsequent to that conference, and at the Court's instruction, the Board drafted an amelioration plan, which was implemented in 1996 and revised in 1999. Among other improvements, the plan computerized the checklist process,[12] reorganized personnel, and put in place various accountability measures. In addition, the revised amelioration plan set forth a goal of reducing by 33% the checklist violation rate[13] and the remedy rate.[14]
 
 
 4. 1997 Stipulations
 
 
 19
 Finally, on December 19, 1997, the District Court approved two stipulations entered into by the parties. Barcia v. Sitkin, Nos. 79 Civ. 5831(RLC) & 79 Civ. 5899(RLC) (S.D.N.Y. Dec. 19, 1997) ("1997 stipulations"). The first stipulation revised the checklists in light of the "may have affected the outcome" standard established in the 1994 order and set forth guidelines for applying the revised checklists and determining, where a violation was found, whether and what remedial measures should be taken. See Barcia v. Sitkin, Nos. 79 Civ. 5831(RLC) & 79 Civ. 5899(RLC)(S.D.N.Y. Dec. 19, 1997), 1997 U.S. Dist. LEXIS 23963, at *3. The second stipulation provided that the Board would re-review certain current and past cases using the revised checklists and guidelines ("re-review cases"),[15] and that the Board was required to provide plaintiffs' counsel with files of up to 450 re-review cases for inspection each year, pending completion of the re-review process. Finally, if in the course of a re-review the Board determined that it was necessary to reconsider the merits of the case, the Board had to reopen the case; in such situations, the Board sent a notice of reopening to the claimant.[16]
 
 C. The Parties' 2002 Motions
 
 20
 In May 2002, plaintiffs filed a motion for (1) modification, and (2) enforcement and further relief.[17] Plaintiffs' motion for modification sought an order directing the Board to prepare another revised amelioration plan to reduce the Board's violations of its obligations under the Consent Judgment as revised by the various stipulations, and their motion for enforcement and further relief sought to change or prevent various practices by the Board.
 
 
 21
 In September 2002, the Board cross-moved to modify the Consent Judgment by terminating its monitoring provisions. Specifically, the Board asked the District Court to declare that the Board was in substantial compliance with the Consent Judgment and, accordingly, to terminate the monitoring rights of plaintiffs' counsel. The Board contended that such a modification was warranted by (1) changes in the law, particularly our decision in New York State National Organization for Women v. Pataki, 261 F.3d 156 (2d Cir.2001) ("NOW"), and (2) changes in factual circumstances — namely, the Board's asserted achievement of substantial compliance with the requirements of the Consent Judgment.
 
 D. The 2003 Decision of the District Court
 
 22
 The District Court issued an opinion and order entered June 16, 2003, denying the motions to modify of both sides, and granting in part plaintiffs' motion for enforcement and further relief. See Barcia v. Sitkin, 2003 WL 21345555 (S.D.N.Y. June 16, 2003).
 
 
 23
 As to the Board's request for modification, the District Court rejected the Board's contention that our decision in NOW constituted a significant change in the governing law that justified the requested modification of the Consent Judgment. Barcia, 2003 WL 21345555, at *3-*4. The Court also rejected the Board's contention that changes in factual circumstances warranted its requested modification; instead, the Court agreed with plaintiffs that — in light of data showing checklist violations in roughly 33% of cases, serious violations in roughly 25% of cases, and a remedy rate of almost 12% — the Board had not achieved substantial compliance.[18] Id. at *4-*7.
 
 
 24
 As to plaintiffs' request for modification, the Court, while denying the motion, directed the Board to reevaluate its compliance efforts and to produce a new plan to reduce its violations of the Consent Judgment. See id. at *7, *11. Finally, the District Court rejected plaintiffs' pleas for enforcement and other relief, except that: (1) with regard to the current cases that the Board reopened upon "re-review" pursuant to the 1997 stipulations, the Court enjoined the Board from sending any reopening notice that failed to provide the specific reason(s) for reopening and further ordered the Board to resend notices of reopening, specifying the reason(s) for reopening, to every claimant whose previously sent notice was inadequate; (2) the Court ordered the Board to maintain all versions of completed checklists, including draft versions, and, in the course of providing access to checklists to plaintiffs' counsel, to provide copies of all checklist versions and information about all changes that are made; and (3) the Court ordered the Board to provide plaintiffs' counsel with a randomly selected sample of re-review cases to replace the sample the Board selected in 1998 with no particular method. Id. at *9-*10.
 
 
 25
 The Board timely appealed.
 
 II. DISCUSSION
 
 26
 On appeal, the Board renews its argument that changes in the applicable law, as well as changes in the factual conditions presented by this case, justify its request to modify the Consent Judgment by terminating the monitoring provisions. It argues further that the District Court erred in partially granting plaintiffs' requests for enforcement and additional relief, contending that the Court had no authority to order the three types of relief that it granted plaintiffs. We address these arguments in turn.
 
 
 27
 A. The Board's 2002 Motion to Modify the Consent Judgment
 
 
 28
 The Board first challenges the District Court's denial of its modification motion, brought under Federal Rule of Civil Procedure 60(b). The Board argues that "significant changes in both the governing law and the factual circumstances strongly support the Board's request that the Consent Judgment be modified to terminate the monitoring period for prospective cases." Appellants' Br. at 32. Contending that change in the governing law justifies the requested modification, the Board asserts that (1) NOW "makes clear that plaintiffs' due process claim underlying the Consent Judgment's imposition of monitoring upon the Board is no longer viable;" and (2) principles of federalism, "emphasized" in NOW and in recent Supreme Court decisions, also support termination of the monitoring provisions. Id. With regard to the independent ground of a change in factual circumstances, the Board asserts that its "recent record of substantial compliance with its obligations under the Consent Judgment, particularly since its implementation [of the amelioration plan in 1996], warrant modification of the Consent Judgment to terminate the monitoring period." Id.
 
 
 29
 Like other judgments and decrees, a consent judgment is subject to Federal Rule of Civil Procedure 60. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378-83, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). That rule, entitled "Relief from Judgment or Order," provides in relevant part:
 
 
 30
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.
 
 
 31
 Fed.R.Civ.P. 60(b). When moving the court to modify a consent decree pursuant to Rule 60(b), the "party seeking an alteration bears the initial burden of establishing that a significant change in circumstances warrants the modification." United States v. Sec'y of Hous. & Urban Dev., 239 F.3d 211, 217 (2d Cir.2001) (citing Rufo, 502 U.S. at 383, 112 S.Ct. 748). This burden may be met by showing that there has been "`a significant change either in factual conditions or in law.'" Id. (quoting Rufo, 502 U.S. at 384, 112 S.Ct. 748). If the party seeking modification meets this burden, the court then must consider whether the modification proposed is "suitably tailored to the changed circumstance." Rufo, 502 U.S. at 383, 112 S.Ct. 748; see also Frew v. Hawkins, 540 U.S. 431, ___, 124 S.Ct. 899, 906, 157 L.Ed.2d 855 (2004) ("If the State establishes reason to modify the decree, the court should make the necessary changes; where it has not done so, however, the decree should be enforced according to its terms.").
 
 
 32
 We review for legal error — or "abuse of discretion" — a district court's decision on a Rule 60(b) motion. Sec'y of Hous. & Urban Dev., 239 F.3d at 216 ("[B]ecause consent decrees are injunctions, their modifications are reviewed for abuse of discretion only."). We have observed that, "[w]hen a district court is vested with discretion as to a certain matter, it is not required by law to make a particular decision. Rather, the district court is empowered to make a decision — of its choosing — that falls within a range of permissible decisions." Zervos v. Verizon New York, Inc., 252 F.3d 163, 168-69 (2d Cir.2001). A district court "abuses" or "exceeds" its discretion when:
 
 
 33
 (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions.
 
 
 Id.
 [19]
 
 
 1. Governing Law
 
 
 34
 Relying on our decision in NOW for the proposition that "the availability of appellate rights will generally defeat a claim of a due process violation arising from alleged procedural violations in a state's administrative hearing process," Appellants' Br. at 36-37, the Board contends that, in the twenty years since the Consent Judgment was entered in 1983, "the law in this Circuit has changed so as to render plaintiffs' claims based on alleged procedural errors by ALJs unmeritorious," id. at 41. It contends that NOW is significant because it applied Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) — which set forth the test for determining whether procedures provide due process — to "a state administrative adjudicatory process where the injury alleged by the plaintiffs could be prevented or redressed in state court." Appellants' Br. at 41. The Board argues that, under NOW, its procedures do not violate due process, so the monitoring provisions — which had been based on alleged due process violations — should be terminated. Id. For the reasons we discuss below, we disagree.
 
 
 35
 Under Mathews, a court must weigh three factors when considering whether administrative procedures provide due process:
 
 
 36
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 37
 424 U.S. at 335, 96 S.Ct. 893.
 
 
 38
 In NOW, we "follow[ed] the now familiar analysis set forth by the Supreme Court in Mathews." NOW, 261 F.3d at 167. As a result, we determined that, although the delays in the processing of discrimination claims by the New York State Division of Human Rights ("Division") "were extensive and may well have been unreasonably so," the second Mathews factor weighed dispositively in favor of the Division. Id. at 168. We reached this conclusion because there was a pre-deprivation remedy available to the plaintiff-claimants. As we stated, "Once the delay in the processing of any claim ... became unreasonable, each member could have brought [a] proceeding [in state court] to mandamus Division officials to proceed expeditiously to resolve the discrimination claim." Id. at 168. Because the mandamus remedy, if exercised, "could have substantially reduced, if not eliminated, the risk of prejudice to their claims from further delay," the claimants had not asserted cognizable Fourteenth Amendment due process violations with regard to the Division's processing of claims. Id.
 
 
 39
 NOW did not address whether the remedy on which the Board relies — namely, the availability of post-deprivation appellate recourse to state court — is sufficient to reduce or eliminate the risk that alleged errors in hearings deprive claimants of due process, and we find no reason to interpret NOW as controlling in that regard. We therefore conclude, as the District Court did, that NOW does not signify a change in the law governing this case and cannot serve as a basis for the modification of the Consent Judgment sought by the Board.
 
 
 40
 Moreover, there is nothing new in the Board's proposition (that it erroneously reads as adopted in NOW) that the availability of post-deprivation relief in state court can satisfy the requirements of due process. That proposition was established at least as early as Parratt v. Taylor, 451 U.S. 527, 538, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), which was decided before the parties in this case entered into the Consent Judgment. Accordingly, we reject the Board's argument that the law on due process has changed since the Consent Judgment was entered so that the availability of plaintiffs' post-deprivation recourse to state court has new legal import warranting the Board's requested modification.
 
 
 41
 Finding little, if any, support for the Board's due process argument, we turn to the Board's second ground for arguing that a change in governing law warrants modification of the Consent Judgment by termination of the monitoring requirement. Here, the Board again relies on NOW as well as recent Supreme Court decisions, contending that the cases "show that the remedy provided for by the Consent Judgment no longer jibes with modern federalism jurisprudence." Appellants' Reply Br. at 15; see also Appellants' Br. at 43-44 (citing NOW, 261 F.3d at 169 ("[R]ecognizing the state courts' responsibility for preventing Division delays through [mandamus] proceedings is more consistent with the `spirit' of federalism than is unnecessarily subjecting state agencies to intrusive federal court intervention under the guise of § 1983."); Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 276, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (Kennedy, J., joined by Rehnquist, C.J.) (where parties rely on federal principles to challenge state administrative action, state courts "have a strong interest in integrating those sources of law within their own system for the proper judicial control of state officials"); Lewis v. Casey, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[T]he remedy must of course be limited to the [constitutional] inadequacy that produced the injury in fact that the plaintiff has established.")). The Board argues that these cases demonstrate "the recent trend ... that discourages intrusive federal court intervention in the operation of state agencies," Appellants' Br. at 43, and that the present case, in which the state has been subject to monitoring by plaintiffs' counsel at the state's expense, is an "even more compelling" situation, id. at 44. It therefore argues that the monitoring provisions should be terminated, in order to reduce the District Court's supervision of a state agency. Id. at 43.
 
 
 42
 The District Court rejected the Board's federalism argument. See Barcia, 2003 WL 21345555, at *3. We do so as well.
 
 
 43
 Although NOW and the recent Supreme Court cases cited by the Board express important principles that should inform generally a federal court's approach to supervision of state entities, they do not call into question the validity of the Consent Judgment, much less change the law, so that modification of the Consent Judgment is warranted. The observation in NOW on which the Board relies — that relief in that case through the use of mandamus proceedings was more consistent with the " `spirit' of federalism" than subjecting state agencies to federal court authority pursuant to relief under § 1983, see 261 F.3d at 169 — does not effect any "significant change" in federalism jurisprudence applicable to the materially different facts of this case. And the Supreme Court cases cited by the Board provide even less support for its position that federalism jurisprudence, as it currently stands, warrants modification of the Consent Judgment. The principle articulated in Lewis — that "the remedy must of course be limited to the [constitutional] inadequacy that produced the injury in fact that the plaintiff has established," 518 U.S. at 357, 116 S.Ct. 2174 — falls far short of discrediting the Consent Judgment's monitoring provisions and thus does not constitute a "significant change" warranting modification through termination of those provisions. Likewise, the general observation of two Justices in Coeur d'Alene — that state courts "have a strong interest in integrating those sources of law within their own system for the proper judicial control of state officials," 521 U.S. at 276, 117 S.Ct. 2028 — fails to establish that federal consent decrees in general, much less the one in this case, do not conform to principles of federalism.
 
 
 44
 Our conclusion that the Board's position lacks merit is reinforced by a Supreme Court decision issued after the parties in the instant case submitted their briefs and argued before us. See Frew v. Hawkins, 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). In Frew, the Supreme Court held that, because a federal consent decree entered into by state officials must "spring[] from a federal dispute and further[] the objectives of federal law," id. at 904 (citing Firefighters v. Cleveland, 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405(1986)), "[o]nce entered, a consent decree may be enforced [in federal court]," id. at 905. To be sure, the Frew Court instructed, in dicta, that a "federal court must exercise its equitable powers to ensure that when the objects of [a consent] decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." Id. at 906. It explained that "the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities" and that the manner of discharge may change as "successor officials, both appointed and elected, ... bring new insights and solutions to problems of allocating revenues and resources." Id. But these general principles, whether considered on their own or in combination with the cases discussed above, do not effect a change in the law governing this case. Indeed, Frew undercuts the Board's reliance on general federalism jurisprudence by reiterating the authority of a federal court to enforce federal consent decrees, as long as the decree was validly entered. Id. at 904 (describing validly entered federal consent decrees as those that "spring[] from a federal dispute and further[] the objectives of federal law"). No one disputes that the Consent Judgment here was validly entered, and therefore the Consent Judgment, including its monitoring provisions, is enforceable.
 
 
 45
 Having concluded that none of the Board's legal bases warrants modification of the Consent Judgment, we turn to the Board's other argument for termination of the monitoring provisions of the Consent Judgment.
 
 
 2. Factual Circumstances
 
 
 46
 In moving for an end to plaintiffs' monitoring, the Board makes the independent claim that it has substantially complied with the Consent Judgment's requirements and that termination of monitoring by plaintiffs' counsel is therefore appropriate based on this change in factual circumstances. The District Court rejected this argument. The Court noted that, according to plaintiffs' data, since the Board implemented the amelioration plan in 1996, the rate of checklist violations — i.e., the percentage of cases appealed to the Board in which one or more procedural errors had occurred in the proceedings before an ALJ, see note 13, ante — had decreased from 51.19% in 1995 to 32.68% in the latter half of 2001, and that the rate had stabilized in recent years to an average rate of approximately 29%. Barcia, 2003 WL 21345555, at *5-*6. Notwithstanding the decrease in violations since 1995, the Court noted that the rate had not improved from the rate in 1992 (28.53%), when plaintiffs first moved for contempt on this issue, and it found that the rate was not yet "stabilized at a level at which it could reasonably be said that the Board provides fair and impartial proceedings that conform to due process of law." Id. at *6. The Court also found that the Board's suggestion to consider instead the remedy rate — i.e., the percentage of cases appealed to the Board in which the Board determined that a remedy was warranted to cure a procedural error below, see note 14, ante — did not bolster its position, because, on average, violations in 11.9% of all cases appealed each year to the Board still required a remedy — "at best a negligible improvement from where [the Board] started in 1996" with a 12% remedy rate. Id. at *5-*6. The Court therefore concluded that the Board's efforts to reduce the rate of checklist violations, although made in good faith, were insufficient to warrant termination of monitoring by plaintiffs' counsel. Id. at *7.
 
 
 47
 On appeal, the Board contends that none of the statistical evidence relied upon by the District Court "demonstrates that the Board is out of compliance with the Consent Judgment," Appellants' Br. at 50. It further contends that the District Court excessively focused on the violation rate and the serious violation rate, and even on the remedy rate, claiming that "nothing in the Consent Judgment or any of its stipulations provides that the checklist violation rate[, serious violation rate, or remedy rate] must be below a particular threshold in order for monitoring by plaintiffs' counsel to be terminated." Appellants' Br. at 47, 48-50. The Board seeks to persuade us that other, non-statistical evidence — essentially, the various measures it has taken since the amelioration plan was implemented in 1996 — establishes its substantial compliance with the requirements of the Consent Judgment. To bolster this position, the Board points to other measures of its progress, such as quarterly reviews of the Board by the United States Department of Labor, in which the Board has exceeded the desired levels of achievement set by the Department; it also draws to our attention the 96.6% affirmance rate for Board decisions appealed to state court. For these reasons, the Board argues that the District Court erred in denying its motion for modification.
 
 
 48
 Although we recognize the Board's improved efforts to adhere to the Consent Judgment, we are not persuaded that the District Court abused its discretion when it determined that the Board was not in substantial compliance with the Consent Judgment and thus did not warrant termination of the monitoring provisions on that basis.
 
 
 49
 As an initial matter, we agree with plaintiffs and the District Court that the "violation rate" and the "serious violation rate,"[20] more so than the "remedy rate,"[21] are "of central concern" in determining whether the Board is in substantial compliance with the Consent Judgment. See Barcia, 2003 WL 21345555, at *6. The purpose of the Consent Judgment is to prevent procedural violations in all cases and to provide full and fair hearings to all claimants, not simply to reduce the rate at which remedies are required to cure procedural violations. The Consent Judgment itself so indicates when it provides that "all parties to [the Consent Judgment] are concerned that the parties to the quasi-judicial process for determining unemployment insurance claims receive fair and impartial hearings," and that "the parties agree that the practices and procedures provided for herein will further the objectives of insuring that unemployment hearings and appeals are conducted in conformity with due process of law." The violation rate and serious violation rate capture the Board's level of success in meeting these objectives.
 
 
 50
 Turning to the data on the relevant rates, we note, as did the District Court, that procedural violations continue to occur in roughly 33% of the cases and that approximately 25% of the cases contain a serious violation. See id. at *7. We further note, as did the District Court, that "after a spike in violations [in 1995], defendants' efforts have landed them at about the same point as in 1992." Id. at *6. These statistics do not support a conclusion that the District Court, which has had jurisdiction over the Consent Judgment for over twenty years, abused its discretion in determining that the Board is not in substantial compliance.
 
 
 51
 Even if we were to conclude that the District Court excessively focused on the violation rate and the serious violation rate — which we do not — we would not conclude that the District Court abused its discretion in finding that neither the remedy rate nor the Board's implementation of various measures supports the Board's request for modification. Although the Board's goal of an 8% remedy rate may be more aspirational than realistic, see discussion post, the rate at which procedural violations continue to occur and require a remedy, i.e., approximately 12%, when considered in conjunction with the rates of violations and serious violations, is not insignificant, even recognizing the Board's efforts to comply.
 
 
 52
 Nor is the Board's request for modification supported by its reference to other measures of its progress, such as the Department of Labor's reviews and the affirmance rate of Board decisions. While these measures may (or may not) influence plaintiffs in their discussions and negotiations with the Board, they do not establish substantial compliance with the Consent Judgment on the part of the Board. For example, the Department of Labor's reviews are based on a much smaller sample of cases than the samples provided for in the Consent Judgment.[22] And, similarly, the Board has not persuaded us that the 96.6% affirmance rate of its decisions by the state court establishes that claimants are receiving hearings that conform to due process requirements. We note, for instance, that the rate fails to account for Board decisions not appealed to state court in which due process may not have been afforded.
 
 
 53
 Because we find no legal error in the District Court's conclusion that asserted changes in neither the governing law nor factual circumstances warrant termination of the monitoring process, we agree with plaintiffs that the monitoring process may continue for the time being, and we affirm the District Court's denial of the Board's motion to modify the Consent Judgment in that respect.
 
 
 54
 Notwithstanding our conclusion that the District Court did not err in refusing at this time to modify the Consent Judgment, we recognize that adherence to the 8% remedy-rate goal originally identified by the Board — or any preconceived benchmark — may not prove realistic or dispositive in measuring the degree to which the Board is in compliance with the Consent Judgment. Returning to Frew, we note the Supreme Court's instruction that a federal court "must exercise its equitable powers to ensure that when the objects of [a consent] decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." Frew, 540 U.S. at ___, 124 S.Ct. at 906; see also id. ("As public servants, the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities."). We also note the Board's concession at oral argument that its original goal of an 8% remedy rate may have been too ambitious, asserting that it is "proving to be very hard" to reach that rate. Oral Argument Transcript, Jan. 13, 2004. The District Court should be mindful of these considerations, and the twenty-year history of the Consent Judgment, in future proceedings in this case.[23]
 
 
 55
 B. Plaintiffs' Motion for Enforcement and Further Relief
 
 
 56
 The Board's appeal also challenges the District Court's partial grant of plaintiffs' motion for enforcement and further relief. The Board argues that the District Court lacked authority to: (1) enjoin the Board from sending any reopening notices that fail to specify the checklist violation(s) in each case that prompted reopening, and order the Board to send new notices of reopening to every claimant whose previously sent notice was inadequate[24]; (2) order the Board to maintain and provide to plaintiffs' counsel all draft checklists and interim changes to checklists in addition to the final computerized version of each checklist[25]; and (3) order the Board to provide plaintiffs' counsel with a randomly selected sample of re-review cases to replace the sample provided in 1998 that had not been selected according to any particular method.[26]
 
 
 57
 We review a district court's interpretation of a consent decree de novo. Tourangeau v. Uniroyal, Inc., 101 F.3d 300, 307 (2d Cir.1996). In interpreting a consent decree,
 
 
 58
 we have recognized that courts must abide by the express terms of a consent decree and may not impose supplementary obligations on the parties even to fulfill the purposes of the decree more effectively. A court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals.
 
 
 59
 Perez v. Danbury Hosp., 347 F.3d 419, 424 (2d Cir.2003) (internal citations and quotation marks omitted). Consistent with this "narrow construction," id., we have held that "a district court may not impose obligations on a party that are not unambiguously mandated by the decree itself," Tourangeau, 101 F.3d at 307 (citation omitted); see also King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir.1995) ("[A] decree is the sole source of the parties' rights.").
 
 
 60
 With these principles in mind, we turn to the three grounds of relief requested by plaintiffs and granted by the District Court.
 
 
 1. Notices of Reopening
 
 
 61
 Before the District Court, plaintiffs challenged the notice used by the Board for cases that it re-reviewed pursuant to the 1997 stipulations and consequently reopened.[27] That notice stated in relevant part:
 
 
 62
 The board has determined to reopen the decision on the board's own motion to reconsider the issues in the case raised by the re-review of the file in accordance with the [1997 stipulations].
 
 
 63
 Plaintiffs disputed the adequacy of the notice, citing its failure to identify the specific checklist violation that warranted reopening and the particular circumstances surrounding the violation.
 
 
 64
 The District Court agreed with plaintiffs and ordered the Board to include in their notices of reopening the specific reason(s) for reopening; the Court also ordered the Board to issue new notices to claimants whose previously sent notices were inadequate. See Barcia, 2003 WL 21345555, at *8-*9. The Court ordered this relief on the theory that the reopening notices were subject to the requirements set forth in Olan v. Ross, 60 A.D.2d 113, 400 N.Y.S.2d 379 (3d Dep't 1977) — New York State law that existed prior to entry of the Consent Judgment. See Barcia, 2003 WL 21345555, at *8. As an alternative ground for holding that the Board had to give specific reasons for reopening a claimant's case, the District Court concluded that preexisting federal law — specifically Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) — required more specific notice than that provided by the Board. See Barcia, 2003 WL 21345555, at *8-*9.
 
 
 65
 On appeal, the Board maintains that neither applicable law nor the Consent Judgment requires that reopening notices in this case state the specific reasons for reopening. Plaintiffs disagree, relying on Olan, Goldberg, and an additional federal case, Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). We agree with the Board.
 
 
 66
 In Olan, the Third Department of the Appellate Division of the Supreme Court of New York held that notices of reopening of unemployment insurance cases, issued after the losing party had appealed to the Appellate Division and filed its brief, were inadequate because they failed to inform the claimants of the specific points to be reconsidered. See Olan, 60 A.D.2d at 114-16, 400 N.Y.S.2d at 380-81. In view of the particular circumstances presented in Olan, that case does not support the broad interpretation suggested by plaintiffs here-that every notice of reopening by any New York State agency must explain specifically what prompted the reopening. Indeed, the Third Department explained in a later case that the rule announced in Olan resulted from the court's "disapproval of the Board's practice of unilaterally reopening a case after the Board had rendered its final decision and after the claimant had filed a brief on appeal ..., for the purpose of curing defects raised in the brief, without giving adequate notice to the claimant of the specific points to be reconsidered by the [Board]." Matter of Bramson Entertainment Bureau, Inc., 136 A.D.2d 807, 808-09, 523 N.Y.S.2d 641, 642 (3d Dep't 1988). Because we are presented in the case before us with wholly different circumstances, we conclude that Olan does not establish that the Board must issue reopening notices that identify the specific reasons for reopening.
 
 
 67
 In addition, nothing in the federal cases on which plaintiffs and the District Court rely requires that notices of reopening in this case specifically identify the reasons for the reopening. We are mindful that in Mullane the Supreme Court stated that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. at 314, 70 S.Ct. 652. Taken out of context, this language seems to support plaintiffs' argument that specific reasons for reopening are required in order to afford plaintiffs "an opportunity to present their objections." Such an interpretation, however, divorces the quoted language from the issue in that case, namely, whether notice by publication was a constitutionally sufficient method of notice — not whether the content of the notice was sufficiently specific. Likewise, the Supreme Court's holding in Goldberg — that due process requires "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend," 397 U.S. at 267-68, 90 S.Ct. 1011 — does not control the instant case. Goldberg stands for the proposition that a notice of hearing must identify a sufficient basis for a claimant's disqualification or ineligibility for benefits, whereas here, cases are reopened if the Board decides that a procedural error may have prejudiced the claimant — an action that does not disqualify or make ineligible the claimant but, indeed, is in the claimant's favor. Moreover, where, after reopening a claimant's case, the Board ultimately issues a decision remanding the case for further proceedings, the Board provides, at that time, a detailed explanation of the basis for its remand. In light of that notice, and because the circumstances here are materially distinct from the factual settings of Mullane and Goldberg, we are persuaded that plaintiffs did not have a federal constitutional right to more specific notice than has been provided heretofore by the Board in its notices of reopening.
 
 
 68
 Having concluded that neither state nor federal law requires the Board, in these circumstances, to identify in reopening notices the specific reasons for reopening, we turn to the Consent Judgment and to the 1997 stipulations, which put into place the requirement that the Board reopen certain cases already once reviewed. The Consent Judgment contains no provisions requiring specificity in reopening notices. Indeed, with regard to notices of reopening of past cases — the Consent Judgment's only mention of reopening notices — it requires merely that the notice state that the Board has reopened the case for further consideration; it does not require the identification of the specific checklist violation or the circumstances in which the violation occurred.[28] And although the 1997 stipulations specifically contemplate the reopening of certain re-review cases, they say nothing about the form or content of reopening notice to be provided. Because neither the Consent Judgment nor the 1997 stipulations require more specific notice than has been provided thus far, and in light of the narrow construction we must accord to consent decrees, see Perez 347 F.3d at 424, we conclude that the District Court had no authority to require the Board to resend notices of reopening in all re-review cases that have been reopened pursuant to the 1997 stipulations, in order to specify the reason for reopening, or to require that the Board specify likewise in all future cases.
 
 
 2. Draft Checklists
 
 
 69
 In the second new obligation imposed on the Board at plaintiffs' request, the District Court ordered the Board to maintain, in the "Master checklist file" and in each case's file, all draft checklists prepared during the Board's review of cases on appeal, thereby making them available to plaintiffs' counsel as part of their access to all checklists and to case files of randomly selected cases. The District Court imposed this obligation on the basis that the parties' course of conduct (i.e., the Board's earlier practice of turning over handwritten drafts of the checklists, prior to switching in 1998 to a computerized system) compelled the conclusion that the word "checklist" in the Consent Judgment included drafts of checklists and indications of any changes made in the preparation of the final checklist for each case. Barcia, 2003 WL 21345555, at *9.
 
 
 70
 On appeal, the Board maintains that it is not obligated to produce draft checklists to plaintiffs, while plaintiffs contend that the language of the Consent Judgment and the Board's practice between 1983 and 1998, in which draft checklists were produced routinely, support the District Court's conclusion. To buttress their position, plaintiffs also rely on the Board's response to plaintiffs' allegation in 1996 that original checklists were being changed or discarded to depress artificially the rate of violations. According to plaintiffs, the Board "informed plaintiffs that it had always provided [plaintiffs' counsel] with originally prepared checklists, showing any later changes or alterations, and that it would continue to do so." Appellees' Br. at 60.
 
 
 71
 We conclude that the Board is not obligated to produce to plaintiffs' counsel draft checklists or other interim changes. As the District Court itself noted, the Consent Judgment does not unambiguously define "checklist" to include drafts or information on changes. See Barcia, 2003 WL 21345555, at *9. Indeed, it makes no reference to drafts, changes, alterations, or any other term reasonably interpreted to describe versions of checklists other than the one that finally records any identified violations. Accordingly, there is no basis to find, as the District Court did, that "the term `checklist' refers to the original checklist review and information about changes that are made," id.
 
 
 72
 We need not decide whether an obligation not unambiguously mandated by a consent decree can be imposed on a state entity on the basis of the parties' conduct, although we find the proposition doubtful, see Tourangeau, 101 F.3d at 307 ("[A] district court may not impose obligations on a party that are not unambiguously mandated by the decree itself." (citation omitted)); King, 65 F.3d at 1058 ("[A] decree is the sole source of the parties' rights."). For, even assuming arguendo that the parties' earlier course of conduct is relevant to the inquiry, we are not persuaded that the Board's earlier practice of producing draft checklists to plaintiffs' counsel was anything other than an accidental byproduct of the manner in which the files, including paper checklists, were maintained.
 
 
 73
 In short, the District Court erred in ordering the Board to provide to plaintiffs' counsel all draft checklists and interim alterations to checklists in addition to the final computerized version of the checklist.
 
 
 3. Sample of Re-Review Cases
 
 
 74
 Finally, in the third new or additional obligation requested by plaintiffs and imposed on the Board by the District Court, the Court ordered the Board to produce a randomly selected sample of cases re-reviewed pursuant to the 1997 stipulations, to replace the sample selected by the Board in 1998 with no particular method.[29] The District Court ordered the replacement sample on the ground that, although the 1997 stipulations specified no particular method for the Board's selection of re-review cases for plaintiffs' sample, other provisions of the Consent Judgment, when obligating the Board to generate samples, required that the samples be random. See Barcia, 2003 WL 21345555, at *10. Noting that "[t]he re-review cases are just a subset of cases under `review' a second time due to problems with the Board's first review," and determining that "[d]efendants have always been required to provide a random sampling of case files for review purposes," the District Court ordered the Board to produce the randomly selected sample requested by plaintiffs. Id.
 
 
 75
 The Board contends that nothing in the Consent Judgment or the 1997 stipulations precluded the Board from selecting a sample of re-review cases in the manner it did — i.e., by selecting files "in no particular order from boxes of decided cases that were immediately and readily at hand in the office," Deposition of Executive Secretary of the Board Joseph P. Kearney, dated August 26, 2002, at 5.
 
 
 76
 We agree with the Board that the sample they provided in 1998 was sufficient to satisfy its obligations under the Consent Judgment. Again, the obligation imposed by the District Court is not unambiguously mandated by the Consent Judgment or by the stipulations. The stipulations only required that a sample be selected; they did not specify a method of selection. We thus conclude that the District Court erred in ordering the Board to provide a replacement sample.
 
 
 77
 Although the Board has no obligation under the Consent Judgment to select re-review samples randomly, we note that it has done so every year since 1998, by selecting every tenth re-review case, until the total reached 450 or 10% of the total number of cases re-reviewed in the given year. In the interest of all parties to the Consent Judgment, we encourage the Board to continue using a random-sampling method of this sort in order to generate data that may not be impugned on the basis of the selection method.
 
 III. CONCLUSION
 
 78
 For the reasons stated above, we conclude that the District Court erred in ordering the Board to: (1) provide in reopening notices the specific reason(s) for reopening cases pursuant to the 1997 stipulations, and resend notices in cases where the specific reason(s) had not been provided; (2) maintain all handwritten draft checklists and changes to computerized checklists, and provide plaintiffs' counsel with access to those drafts and changes; and (3) provide plaintiffs' counsel with a random sample of re-review cases to replace the sample of cases that the Board had selected in 1998. In all other respects, however, the order of the District Court was not in error. Accordingly, the order of the District Court is affirmed in part and reversed in part.
 
 
 
 Notes:
 
 
 *
 The Honorable Michael B. Mukasey, Chief Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Two explanations about the parties are needed. First, the consent decree bound not only the Board, but also its chairman and members, the New York State Department of Labor, and its commissioner. Because it is primarily the Board that supervises the practices and procedures of which plaintiffs complained, we use "the Board" instead of generally referring to "defendants." It should be assumed, however, that obligations of the Board bind the other defendants as well
 Second, although the individual defendants named in the caption no longer serve as the Board's chairman, its members, or the industrial commissioner of the New York State Department of Labor (now known as the commissioner of labor), no one disputes that the consent decree remains binding on their successors. See Fed.R.Civ.P. 25(d) ("When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party.... [A]ny misnomer not affecting the substantial rights of a party shall be disregarded."); see also Advisory Committee Notes to 1961 Amendment to Rule 25(d) ("The amended rule will apply to ... any action brought in form against a named officer, but intrinsically against the government or the office or the incumbent thereof whoever he may be from time to time during the action.").
 
 
 [2]
 "Hearing ALJs" is the precise term used to describe those who hold hearings on claims and issue initial decisions that may then be appealed to the Board. For the sake of simplicity, we use the term "ALJs" rather than "hearing ALJs."See also note 6, post.
 
 
 [3]
 The four cases are:Municipal Labor Committee v. Sitkin, No. 79 Civ. 5899(RLC) (filed Oct. 26, 1979); Barcia v. Sitkin, No. 79 Civ. 5831(RLC) (filed Nov. 1, 1979); Espinosa v. Sitkin, No. 79 Civ. 5831(RLC) (filed Aug. 14, 1980); and New York State Teachers v. Sitkin, No. 79 Civ. 5899(RLC) (filed Oct. 30, 1980).
 
 
 [4]
 42 U.S.C. § 503(a) provides in relevant part:
 The [U.S.] Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act, includes provision for ... [o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied....
 42 U.S.C. § 1983 provides in relevant part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
 
 
 [5]
 Plaintiffs indicate that the Consent Judgment addressed the practices and procedures of ALJs in order to provide "fundamental due process rights ... to claimants[, most of whom are unrepresented,] during all hearings, regardless of whether a claimant files an appeal to the Board." Appellees' Br. at 7-8
 
 
 [6]
 To be precise, the checklists were to be completed by "appeal ALJs," who sit at the Board level and whose regular duties include reviewing hearing records, making recommendations to the Board on both procedural and substantive issues, and preparing draft decisions and remand orders for the Board. For ease of reference, and as indicated in note 2,ante, we use "ALJs" (instead of "hearing ALJs") to refer to the adjudicators who hold hearings and issue initial decisions, and we use "the Board" (instead of "appeal ALJs") to refer to the reviewers of those initial decisions and who, under the Consent Judgment, had the task of completing the checklists.
 
 
 [7]
 The notice of reopening, which was attached as Appendix H to the Consent Judgment, stated in relevant part:
 PLEASE TAKE NOTICE, that the Appeal Board, in order to insure that you received a fair hearing before the Unemployment Referee (or Administrative Law Judge) and the Appeal Board, has REOPENED YOUR CASE FOR FURTHER CONSIDERATION. This further consideration may include your right to have a new hearing, or submit additional evidence.
 If you would like the Appeal Board to give further consideration to its decision to deny you benefits, you MUST fill in the enclosed CLAIMANT RESPONSE FORM, and mail it in the enclosed envelope within 30 days of the date of this Notice.
 
 
 [8]
 As contemplated in the parties'"Post Judgment Attorney's Fees Stipulation and Order" entered on September 27, 1984, the Board financed the monitoring activities of plaintiffs' attorneysSee Barcia v. Sitkin, 1995 WL 527696 (S.D.N.Y. Sept. 7, 1995). According to records maintained by the State Comptroller, since July 1995, approximately $5.3 million in attorneys' fees have been disbursed to plaintiffs' counsel, primarily as compensation for their monitoring activities.
 
 
 [9]
 The claims that the Court considered potentially meritorious were the lack of interpreters at hearings and the inadequate translations of orders or notices in cases of Spanish-speaking claimantsId.
 
 
 [10]
 Although this case reaches us now for the first time, it has a long history that includes not only the four stipulations and orders mentioned in the text above, but also several stipulations and orders not relevant to the appeal. They include:Barcia v. Sitkin, 683 F.Supp. 353 (S.D.N.Y.1988) (award of plaintiffs' attorneys' fees); Barcia v. Sitkin, 1995 WL 527696 (S.D.N.Y. Sept. 7, 1995) (grant of plaintiffs' motion for contempt); Barcia v. Sitkin, 1996 WL 251848 (S.D.N.Y. May 10, 1996) (denial of plaintiffs' motion to modify checklist); Barcia v. Sitkin, 1997 WL 66785 (S.D.N.Y. as amended Feb. 19, 1997) (grant of plaintiffs' motion for contempt and further relief).
 
 
 [11]
 Prior to addressing the issue of which standard to apply in determining whether a checklist violation —i.e., a procedural error — warranted a review of the merits of the case, plaintiffs in 1994 contended that the Consent Judgment required the Board to review each past case both for checklist violations and on the merits, as was done with cases currently on appeal to the Board. The Board disagreed, contending that merits review of a past case was required only if a sufficiently serious checklist violation was identified and that violation was "substantial" or "outcome determinative." Reiterating that the Consent Judgment "sought to provid[e] greater procedural safeguards for class claimants in general," Barcia, 865 F.Supp. at 1032 (quoting Barcia v. Sitkin, Nos. 79 Civ. 5831(RLC) & 79 Civ. 5899(RLC), slip op. at 5, 1983 U.S. Dist. LEXIS 13783, at *10 (S.D.N.Y. Sept. 14, 1983) (amended version of original August 1, 1983 opinion)) (emphasis added), the District Court rejected plaintiffs' contention and held that a merits review of every past case was not required. But, as noted above, it did not adopt the Board's high standard for determining whether a checklist violation required a merits review, for the District Court determined that a merits review was required where the checklist violation may have affected the outcome, rather than, as the Board had suggested, where the violation was substantial or outcome determinative.
 
 
 [12]
 Upon computerization of the checklist process pursuant to the 1996 amelioration plan, the Board no longer maintained changes to checklists or preserved draft or other non-final checklists. Instead, the Board maintained on its computer system a single checklist for each caseSee Barcia v. Sitkin, 2003 WL 21345555, at *9 (S.D.N.Y. June 16, 2003).
 
 
 [13]
 The "checklist violation rate" or "violation rate" reflects the percentage of cases reviewed by the Board in which a procedural violation occurred. The "serious violation rate" reflects the percentage of cases reviewed by the Board in which a serious procedural violation occurred, warranting a merits review of the case. Certain items on the checklists have been categorically identified as serious violations
 
 
 [14]
 The "remedy rate" reflects the percentage of cases reviewed by the Board in which the procedural violation (regardless of its identification as a "serious" violation) requires a remedy, such as a new hearing or the opportunity to submit additional evidence
 
 
 [15]
 Re-review cases were so called because their procedures had already been once reviewed, using the applicable original checklist
 
 
 [16]
 The notice of reopening used by the Board in reopened re-review cases stated in relevant part:
 This is to advise all parties of the reopening of the decision of the Appeal Board filed [date] ([case # )]. The board has determined to reopen the decision on the board's own motion to reconsider the issues in the case raised by the re-review of the file in accordance with the [1997 stipulations].
 [1] All communications should cite the above appeal number.
 [2] The Appeal Board usually decides appeals and reopenings without a new hearing. It relies on evidence taken at the [ALJ] hearing and the written arguments of the parties on appeal....
 [3] Each of the parties may submit, in writing, requests to inspect the minutes of the hearing, or statements, documents or briefs to be considered in connection with an appeal or reopening.....
 
 
 [17]
 Although plaintiffs, in styling their motion, mentioned only requests for "enforcement and further relief," the substance of their motion, as mentioned in the text above, included a request for an order "[d]irecting the Appeal Board to prepare and submit for the Court's approval ... a new proposed amelioration plan." Such a request essentially seeks "modification." We note that the District Court treated the request in that manner,see Barcia v. Sitkin, Nos. 79 Civ. 5831 (RLC) & 79 Civ. 5899 (RLC), 2003 WL 21345555, *7, *11 (S.D.N.Y. June 16, 2003), and we do as well.
 
 
 [18]
 For definitions of "checklist violation rate," "serious violation rate," and "remedy rate," see notes 13 and 14,ante.
 
 
 [19]
 See also United States Circuit Judge Joseph T. Sneed, Trial Court Discretion: Its Exercise by Trial Courts and its Review by Appellate Courts, Address to the Judges of the Second Circuit (Apr. 19, 1982) ("To have discretion is to have choice. To have choice is to be able to choose one course of action over one or more others with immunity from reversal by a higher court because of the course selected. The range of choice is determined by the number of permissible courses of action that exist."), quoted in Zervos, 252 F.3d at 169 n. 6; Rufo, 502 U.S. at 394, 112 S.Ct. 748 (O'Connor, J., concurring in the judgment) ("[A]n appellate court should examine primarily the method in which the District Court exercises its discretion, not the substantive outcome the District Court reaches. If the District Court takes into account the relevant considerations... and accommodates them in a reasonable way, then the District Court's judgment will not be an abuse of its discretion, regardless of whether an appellate court would have reached the same outcome in the first instance.").
 
 
 [20]
 For definitions of "checklist violation rate" and "serious violation rate," see note 13,ante.
 
 
 [21]
 For the definition of "remedy rate," see note 14,ante.
 
 
 [22]
 For the Department of Labor evaluations, the Board selects and evaluates 80 cases each year. Of those 80, the Department itself evaluates no more than 20. This review process is not comparable to the Consent Judgment's checklist procedure under which all of the several thousand cases appealed to the Board each year are reviewed
 
 
 [23]
 While intimating no view on the virtues or shortcomings of the Consent Judgment, we note that several commentators have discussed generally potential dangers of resolving by consent decree class actions and so-called "public interest" or "institutional reform" litigation. Several such critiques were presented at a symposium sponsored by theUniversity of Chicago Legal Forum in 1987. The symposium, entitled Consent Decrees: Practical Problems and Legal Dilemmas, considered risks associated with the use of consent decrees as a policymaking tool. See Owen M. Fiss, Justice Chicago Style, 1987 U. Chi. Legal F. 1, 17 (criticizing consent decrees as "an exercise of public power that has not been preceded by the processes [of the law] that serve as the source of the legitimacy and authority of that power"); Judith Resnik, Judging Consent, 1987 U. Chi. Legal F. 43, 44 (discussing, with "some skepticism," "whether judicial involvement with consent decrees can be the source of their legitimacy"); Burt Neuborne & Frederick A.O. Schwarz, Jr., A Prelude to the Settlement of Wilder, 1987 U. Chi. Legal F. 177 (raising points both in favor of and against the use of consent decrees in public interest litigation); Peter M. Shane, Federal Policy Making by Consent Judgment: An Analysis of Agency and Judicial Discretion, 1987 U. Chi. Legal F. 241, 273 (discussing legal and policy problems posed by consent decrees that limit the future exercise of policymaking discretion, and discussing the possibility of "agency capture" by which, among other things, an agency uses a consent decree to bind itself to action to which it is not opposed); Michael W. McConnell, Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change, 1987 U. Chi. Legal F. 295, 317 (raising objections to the use of consent decrees as tools of governmental policymaking because, among other things, they can "block ordinary avenues of political change" by binding future officials, "sidestep political constraints" by ordering relief unavailable through the political process, and permit collusion between plaintiffs and the agency sued); see also Susan P. Koniak & George M. Cohen, Under Cloak of Settlement, 82 Va. L.Rev. 1051 (1996) (highlighting the possibility of class counsel opportunism in negotiating provisions in settlements and consent decrees to guarantee significant compensation, often at the expense of the class); Donald L. Horowitz, Decreeing Organizational Change: Judicial Supervision of Public Institutions, 1983 Duke L.J. 1265, 1288, 1294-95 (discussing institutional characteristics of courts that cause "[t]he use of litigation to effect change in large, complex, ongoing, public institutions [to be] a more hazardous venture than it is frequently made out to be," and discussing the collusive phenomenon of "nominal defendants [who] are sometimes happy to be sued and happier still to lose"). Most recently, two former litigators with extensive experience in obtaining federal consent decrees against state and local governments have published a critical account of so-called "democracy by decree," which the authors describe as "a good thing gone wrong: It goes beyond the proper business of the courts; it often renders government less capable of responding to the legitimate desires of the public; and it makes politicians less accountable to the public." ROSS SANDLER & DAVID SCHOENBROD, DEMOCRACY BY DECREE: WHAT HAPPENS WHEN COURTS RUN GOVERNMENT 139 (2003).
 
 
 [24]
 For explanation of reopening notices for reopened re-review cases, see notes 15 and 16,ante, and accompanying text.
 
 
 [25]
 For information on the computerization of the checklist process, see note 12,ante, and accompanying text.
 
 
 [26]
 For explanation of the re-review sample, see text following note 15,ante.
 
 
 [27]
 For explanation of the re-review cases and their reopening, see notes 15 and 16,ante, and accompanying text.
 
 
 [28]
 See note 7,ante, for the language of notices of reopening required for past cases.
 
 
 [29]
 For explanation of the re-review cases, see note 15,ante, and accompanying text.